## THE FIN MacCOOL.

(Circuit Court of Appeals, Second Circuit. May 22, 1906.)

### No. 203.

**1.** APPEAL—REVIEW—FINDINGS OF FACT.

While the findings of the trial judge will not be disturbed by an appellate court upon mere questions of fact depending upon the credibility of witnesses who testified before him, unless there is found to be a decided preponderance of evidence to the contrary, a finding based solely on the preponderance of the testimony is open to review and consideration de novo by the Appellate Court.

**2.** NAVIGABLE WATERS—OBSTRUCTION BY WRECK—MAINTENANCE OF LIGHTS.

The rule that positive evidence is ordinarily to prevail over strictly negative evidence applied to an issue as to whether or not lights were burning over a sunken dredge at the time she was run into by a tug in the night, and the testimony of the master of the dredge that he placed the lights on the night in question, and of himself and another witness that they were burning a very few minutes before the accident *held* to

. prevail over the testimony of four witnesses, three of whom were from the tug and including the lookout who was the only one charged with the duty of looking, that they did not see any lights.

Appeal from the District Court of the United States for the Southern District of New York.

W. S. Montgomery, for appellant.

W. J. Martin, for appellee. .

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

WALLACE,, Circuit Judge. This appeal is from a decree condemning the dredge Fin MacCool for the damages caused by the tug Elder by running upon the dredge while the latter was submerged in the Bay Ridge Channel off South Brooklyn. The accident took place about 9 o'clock on the evening of April 21st, a dark but clear night. There were numerous boats displaying anchor lights in the vicinity of the channel. The Elder had a scow in tow on a hawser. The dredge had been sunk by being run into by a tug on the morning of April 19th, and lay under water about 500 or 600 feet from the shore.

The court below based the liability of the dredge upon her failure to maintain a light to notify the obstruction to vessels approaching at night. The case depends solely upon the question of fact whether or not there was a proper light upon the dredge at the time of the accident. The court below in deciding the case said:

"Here are six or eight witnesses who say that they had an opportunity to look, and did look, and did not see any light. There is only one witness who says he saw a light a few minutes before the accident, and there is a stipulation that another man will testify to the same effect. It seems to me that it is a simple question of preponderance of proof. Of course, there are probabilities as to the evidence to be considered, and probabilities are of some weight; but we cannot go against the absolute testimony, and therefore I find that the libelant should recover."

As the appearance and demeanor of witnesses under examination and their apparent candor and intelligence are factors of great importance .in determining the credibility of their testimony, and cannot be carried into the record upon an appeal, the rule obtains in appellate courts that the findings of the trial judge will not be disturbed upon mere questions of fact depending upon the credibility of witnesses who testified before him, unless there is found to be a decided preponderance of evidence to the contrary. The findings of the court below in the present case do not purport to be based upon any question of credibility of the witnesses, but the decision was placed upon the alleged preponderance of testimony in favor of the libelant, apparently because of the greater number of witnesses.

The learned judge fell into an error when he said there were six or eight witnesses who had an opportunity to look, and who testified that they did look and saw no light. The witnesses who testified for the libelant concerning the light on the night in question

were Sjolund, the master of the Elder; Feeley, the engineer; Anderson, the lookout; and Dragon, the master of another vessel.

The witness Sjolund was at the wheel of the tug in the pilot house, and his testimony is as follows:

"Q. How did it happen that you ran on this scow dredge?

"A. Well, I was coming up and did not see nothing which warned me from running on it.

"Q. Were you looking out for anything?

"A. Yes, sir; I was looking out.

"Q. You were at the wheel yourself?

"A. Yes, sir.

"Q. Were you alone in the pilot house at the time the thing happened?

"A. Yes.

"Q. Had there been any one with you?

"A. The steward, Maxfield, was in there a little while before that.

"Q. Did you see any lights to indicate this sunken dredge that you ran on?

"A. No, sir.

"Q. Were there any lights there?

"A. No, sir; not that I saw."

Feely, the engineer, at the time of the accident was on duty in the engine room, and his testimony is as follows:

"Q. Had you been looking out ahead at all times before?

"A. I had several times, on both sides, out of both doors at different times; both doors were open.

"Q. Did you see any lights ahead?

"A. No, sir.

"Q. How long before you felt the shock had you looked out the last time?

"A. I guess a minute or a couple of minutes.

"Q. Did you have any purpose in looking out?

"A. No, I just looked out, the same as anybody would naturally look out of a door."

Anderson's testimony was as follows:

"Q. How were you acting that evening after leaving Bath Beach; were you on deck?

"A. Yes, sir; was on deck.

"Q. What was your duty there?

"A. On the lookout.

"Q. Were you stationed forward on the tug?

"A. Yes.

"Q. Was it your duty to report any lights to your captain if you saw any?

"A. Yes, sir.

"Q. Were you there constantly, watching lights?

"A. Yes, sir.

"Q. Do you remember running on this dredge that was sunk there?

"A. Yes, sir.

"Q. As you came up the channel just before that, did you see any lights upon it?

"A. No, sir; I saw no lights.

"Q. If there had been any there would you have seen them?

"A. Yes, sir; I think so.

"Q. You were watching so as to report to your captain if you saw lights?

"A. Yes, sir.

"Q. You say positively that there were no lights?

"A. I could not see any; no.

"Q. Was it a clear night?

"A. It was a clear night, but dark.

"Q. Good night for seeing lights?

"A. Well, dark."

Dragon was the master of the tug Flannery, which for about an hour before the accident had been lying about three-quarters of a mile from the plaçe of the accident. He testified as follows:

"Q. You do not remember noticing any light on the dredge, do you?
"A. I could not see no light.
"Q. How far away from her were you during the evening?
"A. About three-quarters of a mile, I should think, as near as I could tell."

Another witness was called for the libelant, the engineer of the Flannery. He testified that on the evening prior to the evening of the accident he noticed a light on the dredge about 9 o'clock, which he thought was "a very bum light." He testified, however, that it consisted of two or three tubular lights, two tubes on each side. and that at times it would go down and then flare up again.

Maxfield, the steward of the Elder, testified that he had been with the captain in the pilot house for about half an hour before the collision, smoking with the captain, and left about a minute or two before the collision to go down to the kitchen; and, while he testified that he did not see any lights, also testified that he was not looking for any, and could not have seen any unless he had been standing up in the pilot house instead of sitting down.

Thus it will be seen that there were but four witnesses who testified that they did look and did not see any light on the evening of the accident; that one of these was the master, who was under no duty of special observation, was occupied with his wheel, and until within a moment or two of the accident had been engaged in gossiping and smoking with the steward; that another was the engineer on duty in the engine room of the Elder, who casually and occasionally looked out of the door, and if he did so shortly before the accident may or may not have looked in the direction of the wreck; that another was the master of another vessel lying nearly a mile distant, who had no special interest in observing the light over the wreck, and does not claim that his attention was specially directed to it. The lookout, Anderson, was the only witness whose testimony was of any real value. He ought to have seen the light, if it had been burning, and doubtless would have seen it if his attention had been sufficiently alert.

On the part of the dredge it was proved that on the afternoon of the day she was sunk a carpenter was sent to her and spiked on to the gallows frame a 3x4 scantling, and rigged it with hooks, ring, and halyard for hoisting and lowering lights, arranged to secure the light a sufficient distance above the water to be conspicuous at high tide. It was further proved that about 7 o'clock on the evening of the accident the master of the dredge who had temporary quarters on another vessel lying inshore about 400 feet away, went to the dredge and with the assistance of another man hoisted the lights upon her; and that about four minutes before the Elder struck her, intending to go to bed, he went on deck to see if the lights on the dredge were burning, and saw them burning brightly; that he then went below, partly undressed, and while yet in his stocking feet heard distress signals from a vessel which

proved to be the Elder; and that he then rowed over to the Elder and found her fast upon the wreck. It was also proved by another witness for the dredge, a watchman on a boat lying inshore about 400 or 500 feet from the dredge, that during the evening of the accident he noticed the light burning over the wreck whenever he looked in that direction; and that he saw it very shortly before the accident, and saw it disappear when the accident took place.

The case is one for the application of the rule of evidence that positive evidence is ordinarily to prevail over strictly negative evidence, and that when one or more witnesses testify that they saw an object or heard a signal upon a given occasion, their testimony is to prevail over that of a same number of witnesses, of equal candor, who testify that they did not see or hear it. There is, in such cases, no necessary conflict of evidence as to the fact in question. The observation of the fact by some of the witnesses may be entirely consistent with the failure of the others to observe it, or their forgetfulness of its occurrence. Horn v. Balt. & Ohio R. Co., 54 Fed. 301, 4 C. C. A. 346–351; Rhodes v. U. S., 79 Fed. 740, 21 L. Ed. 644, 25 C. C. A. 186; Stitt v. Huidekoper, 17 Wall. 393. Of course, in each case the opportunities of observation, and the interest prompting the witnesses to attentive observation are to be considered; and the rule referred to is not inexorable, but is to be applied with due regard to the circumstances of the particular case. The whole subject is excellently treated in 17 Cyc. pp. 801–803, where all the authorities are collected.

Upon consideration of all the evidence we are led to the conclusion that the men on board the Elder did not maintain a vigilant observation, and that the lights upon the wreck, though not seen by the lookout or any others of her crew, were visible, and ought to have been discovered.

The judgment is accordingly reversed with instructions to dismiss the libel.