## SPORTIELLO v. UNITED STATES.
## THE SAMUEL ADAMS.

### No. 16646.

District Court, E. D. New York.

May 23, 1944.

Vincent J. Mangano, Jr., of Brooklyn, N. Y. (Joseph F. Ruggieri, of Brooklyn, N. Y., and Samuel Saline, of New York City, of counsel), for libellant.

Burlingham, Veeder, Clark & Hupper, of New York City (C. B. M. O'Kelley, of

New York City, of counsel), for respondent.

GALSTON, District Judge.

This action is brought pursuant to the provisions of the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq.

The libellant's intestate was one of a gang of stevedores employed by Turner & Blanchard, Inc., which corporation was engaged in loading cargo on the S. S. Samuel Adams. On October 3, 1942, the ship was lying bow in on the north side of the pier located at the foot of 31st Street, Brooklyn, New York. Sportiello, with other stevedores of his group, was working in No. 4 hatch. Still other members of the stevedore gang were lifting drafts of sheet iron weighing approximately two tons each to the hold of the Adams from a lighter on the port side of the ship. One winchman operated the port winch and another the starboard winch, and the deck gang included the hatch boss and a gangwayman.

The port side winch was rigged to operate from side to side, and the starboard as an up and down winch. The burton or port winch lifted the draft from the lighter above deck level, and then a fall from the up and down boom carried the draft over to a point above the hold. When the burton winch was slacked off, the up and down winch took the strain and lowered it to the hold.

The booms were rigged when the stevedoring crew came on board to load the cargo. They knew what they were to do and did not require instructions from the ship's company. The gangwayman was stationed to give signals to the winchmen. Customarily when the draft is lowered into the hold and reaches a point about three or four feet above the floor of the hold, it is the duty of men in the hold to guide the draft to the place where it is to be stopped, after which they give the signal to let the draft down.

At the time of the accident, about 3 P. M. on October 3, 1942, Sportiello was standing at the side of the tunnel in the hold on the starboard or in-shore section and as the draft was being lowered suddenly the port winch, through the disengagement of its gears, caused the draft to swing first to the starboard, then to the port, and struck the libellant's intestate, causing his death that day. Such is libellant's claim. The libel alleges that this accident arose and was caused solely by the defective condition of the burton winch and its appurtenances.

The winch in question was manufactured by the American Hoist & Derrick Company, and had two speeds, a low and a high gear. Haight, a marine engineer and ship surveyor, testifying for the libellant, said of the respondent's winch and lever mechanism that it appeared to be the ordinary winch except as to the lever. Describing the operation he said in shifting from one gear to another the handle of the lever is squeezed, releasing the latch, and the lever is free to be moved over to the other side of a quadrant. Then the lever is released, and the spring causes the pawl or latch to engage the opposite gear. In his judgment the pawl was ineffective as a safety device, for, he said, all winches vibrate rather severely when in use; and a pawl is subject to being jarred out of the slot in which it is supposed to be engaged.

In the operation of the winches on the day in question, owing to the weight of the drafts, both winches were put in low gear. It was customary on this vessel, before using the winches, for the engineers to fix the gear ratio as requested by the boss longshoreman. The chief engineer of the vessel testified that some time after the ship was in service he had installed in all winches a bolt and a nut in the quadrant, to prevent the winchmen from changing the gear ratios without the knowledge of the engineer on duty. On the other hand, the libellant contends that such bolt and nut installation was a safety device to prevent the lever from shifting out of gear while the winch was working.

Klinefelter, the chief engineer, and Dembicki, his second assistant engineer, said the gears could not be disengaged unless the winch was first stopped; after which the grip or release trigger at the top of the lever is compressed to lift the latch from the notch so that the lever may be moved to the desired gear position. A pressure estimated at about fifteen pounds is required to overcome the spring tension which holds the latch or pawl in the notch. To move the lever from one gear position to another requires a pressure of about thirty pounds—at least such were the estimates given by Ljungkull, chief engineer of the American Hoisting Derrick Company.

Ljungkull, who designed the winch, said it was of conventional order, having been made and sold by the manufacturers for forty years. Currently it was the type built by them for the British Purchasing Commission, and later for the United States Maritime Commission. The Commission has purchased 15,000 of such winches for use on Liberty ships. When designed and constructed no provision was made for the insertion of a keeper bolt in either of the gear positions. The general design had been approved by Gibbs & Cox, naval architects, and by the Maritime Commission. Each winch was tested before delivery.

Ljungkull disagreed with Haight. He contended that vibration during the operation of the winch would not be sufficient to dislodge the pawl from its notch. He regarded the keeper pin inserted in the holes bored by the chief engineer in the winch on the Adams not as a safety device, but installed for the purpose of preventing unauthorized persons from shifting gears, though to be sure Ljungkull did admit that in present practice a pin is used instead of a pawl. Why the change was requested by the Maritime Commission does not appear. No one from that commission testified and so the matter is left in the realm of speculation.

I must conclude that the gears could not be disengaged during the operation of the winch; and that when a load is on the line it is necessary to stop the winch to shift the gears.

Moreover, on the day of the accident the keeper bolts to prevent shifting of the gears were in place, and were seen by the chief engineer, the second engineer, and an oiler of the crew. Battaglia, an oiler, had inspected and oiled the winches. It is true on his first round he found a loose bolt in the gear shift, and that he tightened against the objection of the winch driver. On his second round of inspection he found nothing wrong with the gear shift.

Klinefelter and Dembicki and Battaglia reached the scene of the accident shortly after it occurred and they observed that the gear lever handle of the port winch was in neutral position and that the keeper bolt was missing. Klinefelter searched for a bolt on the deck adjacent to the winch and as far as the bulwarks of the ship on either side in the vicinity of No. 4 hatch. He also inspected the starboard winch at No. 4 hatch and found that the bolt had been removed from the gear lever and quadrant, but the lever was still in low gear. He made a search for the bolt on the starboard winch gear shift lever and found a bent bolt along the bulwarks on the starboard side of the ship about twenty-four feet away, that could have been the bolt from the starboard winch. However, he could not be certain such bolt was from the starboard gear shift. New bolts were installed in both winches and the work was resumed.

■ In view of the positive testimony given by respondent's witnesses that the bolt and nut were in place, such testimony must be received, for there is no positive testimony by any of the libellant's witnesses that the bolts were not in place at the time the winchmen started operations. The Fin MacCool, 2 Cir., 147 F. 123; The Windrush, 2 Cir., 5 F.2d 425, 1925 A.M.C. 150.

The difficulty with libellant's case is that it leaves too much to speculation. Up to the time of the accident there was nothing unusual observed about the performance of the winches. Whether the vibration caused by the operation of the engines, winches and draft could and would dislodge the bolt in the quadrant, rests wholly on Haight's opinion as against that of DeMars and Ljungkull.

Haight, under cross-examination, admitted that he had never seen the winch slip out of gear and had made no tests to determine whether the winch gears might be disengaged while in operation. Captain DeMars, respondent's expert, did make such a test and it resulted in his confirming Ljungkull in the opinion that the gears could not be shifted while the engine was running.

In the realm of speculation it is not unreasonable to suppose that the winchmen protested against the tightening of the bolts so that they might shift the gears if they so desired. In the low or compound gear the winch moves slowly. The slow gear ratio is needed to take the drafts from the lighter, but was not required when the sling was returned light. Another possible explanation of the accident is that given by Klinefelter, that the port winch driver, having control of the draft by means of his throttle, might have caused it to swing.

■ In the light of the possibilities, as well as in the failure of positive proof, the libellant has not met the burden of proof imposed upon her.

■ At the close of the case the respondent moved to dismiss on the ground that the court was without jurisdiction, pointing out that this is a suit under the Suits in Admiralty Act, and that therefore it was obligatory upon the libellant to show that the vessel, the property of the United States, was within the jurisdiction of the United States at the time of the filing of the libel. Decision on that motion was reserved, but must now be resolved against the respondent.

It appears from the libel that the Steamship Samuel Adams, at the time the libel was filed, was at sea and that it was about to come within the jurisdiction of this court. The respondent admits the ownership of the vessel and its possession and control, and also that the vessel at the time of the filing of the libel was at sea and was about to, or would come within the jurisdiction of the court. At the trial the respondent proved that on November 9, 1942, the day on which the libel was filed, the vessel was somewhere between the Panama Canal and Durban, South Africa.

At the conclusion of the case, the respondent, for the first time, called the attention of the court to the fact that it contended that since the vessel was not within the United States when the libel was filed, the court was without jurisdiction, relying upon Blamberg Bros. v. United States, 260 U.S. 452, 43 S.Ct. 179, 67 L.Ed. 346, and Carroll v. United States, 2 Cir., 133 F.2d 690.

It is, of course, entirely clear that if this suit were one in rem, and if the vessel were not within the jurisdiction of the United States at the time that the libel was filed, under those decisions the court would be without jurisdiction. The question is narrowed, however, to a consideration of whether, if the suit be one in personam, the presence of the vessel within the United States at the time of the filing of the libel is necessary.

In Blamberg v. United States, supra, the libel was in personam. It alleged that the libellant had shipped bags of corn from Baltimore to Havana; that it had not been delivered in accordance with the terms of the bills of lading and that due to delay the corn had deteriorated. The Government contended that a libel in personam would not lie, nor a libel in the nature of an in rem proceeding, for the reason that at the time of the filing of the libel the vessel had been at the port of Havana and without the jurisdiction of the court. The sole question presented to the court was whether the District Court properly considered the second section of the Suits in Admiralty Act as not authorizing a suit in personam against the United States as a substitute for a libel in rem when the United States vessel is not in a port of the United States or one of her possessions. It was held that the District Court was right in holding that the Suits in Admiralty Act does not authorize a suit in personam against the United States *as a substitute for a libel in rem* in such circumstances. But the decision went no further.

In Carroll v. United States, supra, the libellant was a seaman who sought to recover for personal injuries against the United States and the Waterman Steamship Agency. The libel was filed under the Suits in Admiralty Act and alleged that the vessel, at the time of the filing of the libel, "is in or soon will be within the jurisdiction of the United States and of this Court." [133 F.2d 691.] At the trial the libel was amended by striking out an allegation that the libellant elected to proceed in rem, and added that the suit was brought not only under the Suits in Admiralty Act, but also under the Jones Act, 46 U.S.C.A. § 688. The ship was not in the United States when the libel was filed, and at the trial it was stipulated that she was then "in the Harbor of New York at Jersey City." Judge Learned Hand wrote:

"As against the United States the decree must be reversed and the libel dismissed. Blamberg v. United States, 260 U.S. 452, 43 S.Ct. 179, 67 L.Ed. 346, decided that it was a condition upon substantive jurisdiction under the Suits in Admiralty Act that the vessel should be within the United States when the libel was filed. The 'Gallant Fox' was not shown to have been within the United States at that time and the district court was without jurisdiction. This would be equally true, even though we were to construe the condition as applicable only when the right asserted against the United States is in rem. We do not mean to suggest that the condition is so limited, but we need not decide the question, because, so

far as appears, the acts of the Waterman Steamship Agency would not have charged the United States in personam if it had been a private owner."

Prior to the decision of Carroll v. United States, supra, it had been held in Cross et al. v. United States, D.C., 8 F.2d 86, 87, after consideration of Blamberg v. United States, 260 U.S. 452, 43 S.Ct. 179, 67 L.Ed. 346, that no libel in rem lies against a vessel where the vessel is not within the borders of the United States, but,

"It cannot be the rule that a libel in personam only lies in case the vessel is within the borders of the United States, although the libel in rem does not lie unless she is within the waters of the district."

So too, in the Tug Nonpareil,[1] Judge Ward wrote:

"It is a mistake to suppose that the Supreme Court in the case of Blamberg v. United States, 260 U.S. 452, 43 S.Ct. 179, 67 L.Ed. 346, or the Circuit Court of Appeals of this Circuit in The Isonomia, 2 Cir., 285 F. 516, 1923 A.M.C. 132, held that if a vessel which would be liable in rem if privately owned were not within the district, no suit could be maintained against the United States in personam."

Judge Ward went on to distinguish the Blamberg case by pointing out that the United States was under no personal liability because the vessel, at the time the cause of action arose, was in the possession and control of the chartered owner and was at the time of suit in Havana, and therefore a suit against the United States in personam could not be maintained. In the case of the Isonomia, he pointed out that it was held that a suit in personam could not be maintained for the reason that the libellant had sued because of a lien upon the vessel and it elected "that this libel shall proceed in accordance with the principles of libels in rem".

See also Eastern Transp. Co. v. United States, (The Snug Harbor) 272 U.S. 675, 47 S.Ct. 289, 71 L.Ed. 472.

I think that Carroll v. United States, supra, did not intend to go further than the doctrine stated in Blamberg v. United States, supra.

The respondent may have a decree. Appropriate findings of fact and conclusions of law will be filed concurrently herewith.

---

[1] No opinion for publication.