Petition of TEXACO, INC., formerly The Texas Company, as owner of the TUG ALL AMERICAN, in a cause of exoneration from or limitation of liability.

Petition of The CITY OF NEW YORK, as owner of the FERRYBOAT TOMPKINSVILLE for a limitation of or exoneration from liability.

United States District Court
S. D. New York.
Sept. 6, 1961.

Brush & Michelsen, New York City, for Texaco, Inc.; Joseph M. Brush, New York City, of counsel.

Harry L. Side, Asst. Corp. Counsel, New York City, for City of New York.

Kane, Grae & Agar, St. George, Staten Island, N. Y., for claimants. Solomon R. Agar, St. George, Staten Island, N. Y., of counsel.

PALMIERI, District Judge.

## INTRODUCTORY STATEMENT

The subject of the findings and conclusions hereinafter set forth is a nighttime collision which occurred on January 5, 1959, when the ferryboat Tompkinsville, owned and operated by the petitioner, the City of New York, collided in Upper New York Bay with a light oil barge, the Texaco 396, owned and operated by the petitioner, Texaco, Inc., formerly the Texas Company. The collision resulted in damage to both vessels and in personal injuries to a number of passengers on the ferryboat. Until a short time before the impact, the oil barge had been in tow of the Texaco tug All American.

Petitions for exoneration from or, in the alternative, limitation of their respective liabilities, were filed by the City of New York, as owner of the ferryboat Tompkinsville, and Texaco, Inc., as owner of the tug All American, each contending that the collision was solely the fault of the other. Opposing both petitions, the personal injury claimants actively participated in the consolidated trial proceedings.

## FINDINGS OF FACT

1. The ferryboat Tompkinsville, owned and operated by the City of New York, a municipal corporation organized and existing under the laws of the State of New York, left her slip at the Battery, Manhattan, on January 5, 1959, at about 6:07 P.M., bound for St. George, Staten Island. The Tompkinsville was a vessel of about 260 feet in length and about 54 feet beam, equipped for the carriage of motor vehicles and passengers, with passenger cabins located on the port and starboard sides of the main deck and on the upper deck. It had a bow propeller and a stern propeller, both attached to the same shaft, one pulling and the other pushing. Its normal running time for the trip between the Battery and St. George, depending on traffic and weather conditions, was between 20 and 30 minutes and its average speed was 13 knots over the bottom. On the trip in question the Tompkinsville was

in command of Captain Maitland O. Brown and Assistant Captain Casimiro Zerilli.

2. The crafts owned and operated by Texaco, Inc., the 600 horsepower steam tug All American with the steel oil barge Texaco 396 in tow astern on a bridle hawser, had left Whitestone, Long Island, about 2:30 in the afternoon of January 5, 1959, bound for the Texaco terminal at Bayonne, New Jersey. The tug, in command of Captain Frederick H. Johnson, was 95 feet long, 23 feet beam, and 12 feet draft. The barge was without motive power or steering gear and was 895 tons gross, 886 tons net register, 210 feet long, 40 feet beam, and 12 feet depth, with a free board of 9½ feet. The Texaco 396 was light and without ballast. She was tight, staunch, strong, fully manned, equipped and supplied.

### The Situation of Tug and Barge Up to the Time of Collision

3. After leaving Whitestone, Long Island, the tug and tow proceeded at a speed of about 6 knots over the bottom down the East River, through Hell Gate, around the Battery, and down the main ship channel of the Upper Bay in the vicinity of buoy 31.

4. Texaco's Exhibit 11 illustrates the manner in which the barge was secured to the tug. The bridle was made up of two Swedish wire lines made fast to each corner of the barge. The end of the bridle at which the wire lines met was secured by shackle thimble to a comparatively new manila hawser, 8 inches in circumference and 2½ inches in diameter, which was made fast around the stern towing bitts of the tug.

5. The hawser had been shortened to about 8 feet with a 50 foot bridle for passage through Hell Gate and was kept shortened as the tow proceeded from the East River, past the Battery, into the open expanse of Upper New York Bay.

6. The tug All American and her tow, the Texaco 396, displayed regulation lights as they proceeded down the main ship channel of the Upper Bay. In addition to her forward mast light and red and green side lights and for the purpose of indicating that she had a tow astern, the tug exhibited three white lights on her staff, visible around the horizon for a distance of at least two miles. As illustrated in Texaco's Exhibits 3 and 4, the barge displayed two white lights, one forward and one aft, on staffs about 14 feet above the deck, visible around the horizon for a distance of at least two miles.

7. On January 5, 1959, throughout the day, a gale which had commenced on the preceding day was blowing from force 7 to 11 on the Beaufort scale, with strong northwest winds above 34 miles per hour and with gusts up to 75 miles per hour. At about 6:10 P.M., gusts of over 60 miles were recorded at the weather station atop the Whitehall Building. Prior to the collision, storm warnings for small craft had been posted by the Coast Guard. The sea was rough and choppy. High winds and passing vessels created swells ranging from two to four feet high in the Upper Bay. The temperature was below freezing at about 17° Fahrenheit.

8. Shortly before 6:15 P.M. a sudden swell combined with choppy seas caused the hawser to part, separating the tug from the barge. The barge continued underway in a southeasterly direction and into the path of the oncoming ferryboat Tompkinsville. At the time the hawser parted the ferryboat was approximately ¾ of a mile away, almost directly astern and slightly to port of the tug.

9. Captain Johnson of the tug All American was looking out of the open port side window of the pilot house and saw the hawser part. He immediately sounded an alarm signal of four short blasts of the tug's whistle and turned on the tug's 1000 watt, 18 inch diameter searchlight located on the top of the tug's pilot house, playing the light on the barge. About a minute later, he sounded a second four blast alarm signal.

10. The tug All American stopped, backed, and proceeded close to the Texaco 396 in order to run another towing line out to it.

11. In the interim, the barge Texaco 396 continued ahead under the impetus of the wind and tide and her previous momentum. She moved in this fashion in a southeasterly direction a distance of approximately 150 feet.

12. The tug All American continued to play her searchlight on the barge as a warning to vessels in the vicinity and in order to keep the barge under observation.

### The Situation of the Ferry Up to the Time of Collision

13. After leaving her slip, the Tompkinsville proceeded around the north end of Governor's Island toward buoy 31 and then turned left and continued down the west side of the main ship channel towards St. George.

14. When the Tompkinsville was about abreast of Governor's Island, Captain Brown turned over the conn of the vessel to Mr. Zerilli and retired to the settee in the pilot house.

15. In the vicinity of buoy 31, a tug exhibiting three white staff lights, indicating a tow astern, was observed by those in charge of the Tompkinsville about a mile or more away and slightly to starboard of the ferry's projected course.

16. The Tompkinsville intended to overtake and pass the All American and her tow. The Tompkinsville was unable to see the side lights of the tug and did not at any time blow a whistle signal to communicate her desire to pass the tug.

17. From the time she reached buoy 31 to the time of the collision the ferryboat Tompkinsville continued at full speed ahead—a speed of about 13 knots over the bottom. She did not slow down until after the collision.

### The Collision

18. In the vicinity of Greenville, Mr. Zerilli observed a dark object in the water, about 600 feet ahead, whereupon, with the assistance of Captain Brown, who jumped up from the settee, the ferryboat wheel was put hard left.

19. The Tompkinsville, under the hard left rudder, attempting to turn away from the barge, swung her stern to starboard and into collision with the forward port corner of the Texaco 396.

20. The collision occurred at 6:15 All American time, 6:23 Tompkinsville time, more than three minutes after the tug had turned on its searchlight, playing light on the separated barge.

21. If the Tompkinsville had continued on her course after passing buoy 31, and the All American with her tow had continued on her course, the vessels would have passed at least 150 feet apart.

### The Fault of the Ferry

22. The ferryboat Tompkinsville was proceeding at a speed of about 13 knots and could have overcome her headway, that is to say, she could have stopped in the water, within 600 or 700 feet or about two of her lengths.

23. Two of the deckhands of the Tompkinsville, one on the upper deck and one on the lower deck, were assigned to act as lookouts, in addition to other duties. Neither stood a continuous forward lookout watch.

24. The deckhand lookouts observed the three staff lights of the tug All American about a mile or more away when the ferry was on a course to overtake and pass the tug and tow but neither lookout reported the lights of the tug to those on watch in the ferryboat's pilot house or made any attempt to ascertain the location of the tow of the tug. Indeed, neither deckhand gave the pilot house any lookout information during the entire trip and they customarily reported only such conditions as, in their opinion, they considered to be dangerous. Mr. Zerilli did not see the deckhands during the trip in question nor did he receive any reports from them prior to the collision. He made no attempt to check with the deckhand lookouts and considered that he did not need their information. Captain Maguire, the director of ferry operations for the City at the time of the collision herein, had knowledge that adequate

lookouts were not maintained on City ferries.

25. The searchlight of the tug and the lights exhibited by the barge were observed by independent witnesses who were passengers on the ferryboat Tompkinsville. The searchlight of the tug was observed by one of them more than three minutes before the collision.

26. Captain Brown, Mr. Zerilli, and the lookouts of the Tompkinsville did not see the lights on the barge. Those in command of the Tompkinsville observed the searchlight of the tug for the first time approximately fifteen seconds before the collision.

27. Although Mr. Zerilli did see the tug All American with the staff lights indicating the tow when he was at buoy 31, he did not see the Texaco 396 until just before the collision when the barge was approximately 600 feet ahead.

28. The evidence in the record is not sufficient to establish that, under the conditions prevailing on the night of January 5, 1959, the blasts of the tug All American were audible to persons aboard the Tompkinsville.

29. Captain Brown and Mr. Zerilli, by the exercise of reasonable diligence and attention to their duties, could have seen the lights on the barge and the searchlight of the tug All American played on the barge when the Tompkinsville was approximately ¾ of a mile away, in ample time to appraise the situation, reduce speed and prevent collision. The position of an upstream tow on the ferryboat's port side in no way impaired the ability of the ferry to avoid collision.

### The Fault of the Tug

30. The length of the hawser and bridle used by the tug All American to tow the barge Texaco 396 was too short in view of the velocity of the wind, the swells and the light condition of the barge, presenting to the wind a freeboard of approximately 9½ feet in height and 210 feet in length. The short length of the hawser and bridle, coupled with the very cold weather, probably destroyed the elasticity of the hawser, thereby rendering it frozen and brittle and consequently increasing the likelihood of its parting. A longer hawser, which would have occasionally dipped into the salt water, would have tended to attenuate the dangers resulting from a frozen condition.

31. Although the tow was not secured to the tug in a manner which, under the prevailing weather conditions, would have diminished the risk of parting, the separation of the tug from the barge did not occasion the collision because the ferryboat, by proceeding with reasonable care and diligence, could have avoided the danger of the situation.

### CONCLUSIONS OF LAW

1. On January 5, 1959, at the time of the collision, the ferryboat Tompkinsville was negligently operated and was not under competent direction and control. In proceeding on her run as indicated herein, the Tompkinsville violated her statutory duties as an overtaking vessel and her obligation to keep a proper lookout. 33 U.S.C. §§ 203, Rule VIII, 209, 221.

2. Had reasonable care been exercised aboard the Tompkinsville to comply with the Inland Rules applicable to overtaking situations and to keep a proper lookout, there would have been ample opportunity to change the speed and course of the ferryboat in time to avoid collision. Cf. Yacht Escape II—Tanker M.J. Derby II, 194 F.Supp. 353, 1961 A.M.C. 690 (S.D.N.Y.1960).

3. The said failure to exercise reasonable care rendered the Tompkinsville solely responsible for the collision. See The Sanday, 122 F.2d 325 (2d Cir., 1941); The Cornelius Vanderbilt, 120 F.2d 766 (2d Cir., 1941).

4. The petitioner Texaco, Inc. is entitled to exoneration from liability with respect to the collision which occurred on January 5, 1959 and its petition therefor is granted.

5. The claimant, Texaco, Inc. is entitled to a decree against the City of New

York for the damage sustained by its barge Texaco 396 as a result of the collision which occurred on January 5, 1959.

6. The claims of the passengers on the ferryboat Tompkinsville against Texaco, Inc. are dismissed.

 7. The petitioner the City of New York, having failed to meet its burden of establishing that it had no knowledge of the operational negligence involved here, is not entitled to exoneration from or limitation of liability with respect to the collision which occurred on January 5, 1959, and its petition therefor is denied.

8. The claims of the passengers of the ferryboat Tompkinsville against the City of New York should be sustained and the quantum of the damages suffered by each of them should be referred to a Special Commissioner for appraisal and further report to this court.

Submit form of decree on notice.