**MORAN SCOW CORPORATION and TUG M. MORAN, INC., Plaintiffs,**

v.

**S.S. BOSTON and Mystic Steamship Corporation, Defendant-Claimant,**

v.

**MORAN TOWING & TRANSPORTATION CO., Inc., Moran Towing Corporation, TUG HELEN B. MORAN, INC., Warwick Curtis Bay Co., TUG DIANA L. MORAN, TUG TERESA MORAN, DUMP SCOW MORAN 106 and DUMP SCOW MORAN 112, Defendants to Counterclaim.**

**No. 68 Civ. 696.**

United States District Court,
S. D. New York.

May 2, 1972.

**218**

Burlingham, Underwood, Wright, White & Lord, New York City, for plaintiffs and defendants to counterclaim; Eugene Underwood, Kenneth H. Volk, Peter W. Carlson, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for defendant-claimant; Arthur J. Blank, Jr., Richard H. Brown, Jr., Robert O. Phillips, New York City, of counsel.

## OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW

LEVET, District Judge.

Plaintiffs Moran Scow Corporation ("Moran") and Tug M. Moran, Inc. ("Tug Moran") institute this action against the above-named defendant-claimant S.S. Boston ("Boston") and Mystic Steamship Corporation ("Mystic"), owner of the Boston, for alleged damages arising from a collision between the Boston and the Dump Scow Moran 106 occurring on December 27, 1967 near the Verrazano-Narrows Bridge.

To this complaint the Boston and Mystic interposed an answer and a counterclaim against said plaintiffs and the other impleaded parties-defendants hereinbefore set forth in the title.

The general background of the collision involved in this case is as follows:

In the late afternoon of December 27, 1967, the tug Diana L. Moran ("Diana") departed from the loading shed at 37 Street, East River, New York City with scow Moran 106 and scow Moran 112 in tow alongside. Each scow was loaded with debris to be dumped at sea off the coast of New Jersey.

Tug Diana had been instructed to proceed to a position off Pier 25, Staten Island, where she was to be relieved by tug Teresa Moran ("Teresa"), which would take the two tugs in tow and continue the voyage to sea.

The tug Diana with the two scows in tow arrived off Pier 25, Staten Island and met the tug Teresa; at that point the Moran 106 was lined up ahead of the Moran 112, with the tug Diana's port side made fast to the after starboard side of the Moran 112.

The tug Teresa moved forward along the starboard side of the Moran 106 so that her stern was up against the bow of that scow; the tug Teresa fastened a bridle to the bow of the Moran 106 and the main towing hawser of the tug Teresa was then secured to the bridle.

When the tug Teresa commenced to let out her hawser, her master, by radio, released the tug Diana. Soon thereafter, the Boston sounded a two-blast whistle signal; nevertheless, the Boston, after the tug Diana and the tug Teresa responded with a danger signal, turned to the left and the bow of the Boston struck the after port side of the Moran 106 at about a right angle, resulting in damage to both scows and to the Boston.

### ISSUES

Plaintiffs and the other Moran corporations (appearing as Defendants to Counterclaim) contend:

" . . . that the collision was due solely to the fault and negligence of the BOSTON and those in charge of her in that she failed to keep to her own starboard side of the channel, failed to maintain an alert and proper visual lookout, failed to maintain a proper and alert radar watch, negligently and improperly turned to port, she was proceeding at an immoderate rate of speed and she failed to slow or stop or take any appropriate avoiding maneuvers when confronted with risk of collision." (Pretrial Order, at 3–4.)

After denying plaintiffs' aforesaid claims, the defendants, the Boston and Mystic, contend that:

1. The tug Teresa showed no towing lights;

2. The tug Diana, although substantially dead in the water, showed lights indicating that she had a tow alongside and had failed to turn on the required navigation lights upon casting off from the tow;

3. Neither tow was displaying proper navigation lights and neither could be

seen by Boston's men. (Pretrial Order, at 4; see also allegations of fault by scows 106 and 112, tugs Diana and Teresa, answer and counterclaim, at 4–6.)

An admiralty case, it was tried to the court without a jury.

After hearing the testimony of the parties, examining the exhibits, the pleadings and the proposed Findings of Fact and Conclusions of Law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Plaintiff Moran Scow Corporation is a corporation organized and existing under the laws of the state of Maine and at all pertinent times was the owner of Dump Scow Moran 112. (Pretrial Order ("PTO"); 256.) [1]

2. Plaintiff Tug M. Moran, Inc. is a corporation organized and existing under the laws of the state of New York and at all pertinent times was the owner of Dump Scow Moran 106. (PTO; 259.)

3. Moran Towing Corporation is a corporation organized and existing under the laws of the state of New York and at all pertinent times was the manager and operator of Dump Scows Moran 106 and Moran 112. (PTO; 260.)

4. Helen B. Moran, Inc. is a corporation organized and existing under the laws of the state of Maine and at all pertinent times was the owner of the túg Diana. (PTO; 260.)

5. Warwick Curtis Bay Co. is a corporation organized and existing under the laws of the state of Delaware and at all pertinent times was the owner of the tug Teresa. (PTO; 260.)

6. Moran Towing & Transportation Co., Inc. is a corporation organized and existing under the laws of the state of New York and at all pertinent times was the operator of the tugs Diana and Teresa (PTO; 259–260.)

7. Defendant Mystic Steamship Corporation is a corporation organized and existing under the laws of the state of Delaware and at all pertinent times was the owner and operator of the S.S. Boston. (PTO; 259.)

8. Dump Scow Moran 106 is a non-propelled barge of 940 gross tons, 168 feet in overall length and 43 feet in breadth. (PTO; 261.)

9. Dump Scow Moran 112 is a non-propelled barge of 964 gross tons, 168 feet in overall length and 43 feet in breadth. (PTO; 261.)

10. Tug Teresa is a diesel tug of 299 gross tons, 102 feet in overall length and 28 feet in breadth. (PTO; 261.)

11. Tub Diana is a diesel tug of 239 gross tons, 100 feet in overall length and 27 feet in breadth. (PTO; 261.)

12. The S.S. Boston is a single screw cargo vessel of 6,753 gross tons, 443 feet in overall length and 57 feet in breadth, of American registry. (PTO; 260–261.)

13. Late in the afternoon on December 27, 1967, the tug Diana departed the loading shed at 37th Street, East River, with scows 106 and 112 in tow alongside. Each scow was fully loaded with debris to be dumped at sea off the coast of New Jersey. (Pl. Ex. 9; Pl. Ex. 20, at 325; 60, 123.)

14. The tug Diana had been instructed by Moran's dispatching office to proceed to a position off Pier 25, Staten Island, where she was to be relieved by the tug Teresa, which would take the two dump scows in tow and continue the voyage to sea. (62–63, 7.)

15. About 8:00 P.M. the Diana flotilla arrived at the designated rendezvous point off Pier 25, Staten Island, where she was met by tug Teresa which had come out of Kill Van Kull and down through the Stapleton Anchorage area. (7, 33–34, 198–199.)

16. At this time the weather was clear with good visibility and the night was dark with no moon; the wind was

1. Unless otherwise indicated, numbers in parentheses refer to pages in the stenographer's minutes of the trial.

negligible; the surface of the water was calm; and the current was ebbing at approximately two knots. (PTO; 260; Deft. Ex. J, at 112; Deft. Ex. C, at 16; Pl. Ex. 42; 7, 19, 63, 388–389.)

17. On the same night of December 27, 1967, the Boston was inbound from Norfolk, Virginia, carrying a full load of 10,288 tons of coal. At 7:54 P.M. she passed Buoy 14 making full speed of about 10½ knots and altered course to starboard to 344° true heading up the last leg of Ambrose Channel toward the Verrazano Bridge. (394, 399–401; Pl. Ex. 42; Deft. Exs. R and S.)

18. Very shortly after passing Buoy 14, those on the Boston observed ahead, near the Verrazano Bridge, a cluster of lights, including the two vertical white towing lights of the tug Diana, which at that time was recognized to be a tug with a tow either alongside or ahead. The tug Teresa was also seen and later recognized to be a tugboat. (395–396, 445, 463, 508–509; Pl. Ex 40; Deft. Ex. J, p. 96.)

19. The Boston thereafter proceeded on various courses tending to keep to her own starboard or easterly side of the channel as she continued on at full speed. (439, 441.)

20. At 8:00 P.M. when the tug Teresa joined the tug Diana and the two dump scows, the Diana's port side was made fast to the after starboard side of the scow 112, and scow 106 was directly ahead of the 112, her stern being up against the bow of the 112 and made fast with lines at each corner. (Pl. Exs. 2 and 16; 8, 10, 61, 199, 201.)

21. At 8:00 P.M. when the tug Teresa joined the tug Diana flotilla, the Diana and the two scows were headed toward the westerly of Staten Island end of the Verrazano Bridge about a mile away and were practically dead in the water, making about three or four knots over the ground, including the two-knot current. (62–63, 69–70, 33, 54, 208.)

Members of the crew on the Boston concede and I find that the Diana and her two scows appeared to be just about dead in the water, at least until three minutes prior to the collision. (Deft. Ex. J, at 97; Deft. Ex. C, at 16; 495.)

22. When the tug Teresa joined the tug Diana and the two scows at 8:00 P.M., she proceeded to take a position forward of tug Diana alongside the starboard quarter of scow 106 and her deck hands passed over to the scowmen an intermediate hawser to be let out when they reached the ocean. Two powerful floodlights were turned on aboard the tug Teresa illuminating the tug's stern area so that the men could carry out this job. (10–12, 23, 39; Pl. Ex. 2; 201–202, 137; Pl. Ex. 29, at 484.)

23. After the intermediate hawser had been placed aboard the scows ready for use, the tug Teresa moved forward along the starboard side of the scow 106 so that her stern was up against the bow of that scow. In the process of moving forward, she turned on three vertical white lights on her main mast, indicating a tow astern. At that time, she was also displaying her required red and green side lights, together with the floodlights. (12–13, 65, 137–138, 203–205; Pl. Ex. 29; Pl. Ex. 17; Pl. Ex. 31, at 538; Pl. Ex. 34.)

24. I find that the tug Teresa turned on her three white vertical towing lights indicating a tow astern prior to the time of the collision. The evidence supports this finding.

Besides all the Moran witnesses testifying to this fact, an independent witness, Captain Sullivan, the pilot of the outbound vessel, Valiente, substantiates this finding. Captain Sullivan testified unequivocally as follows:

"My recollection was that the forward towing boat had three white lights in a vertical line, plus the navigational lights. The green light is what I saw. She had deck lights on. The aft boat to the best of my recollection had all her running lights on. And her deck lights on." (Pl. Ex. 31, at 538.)

Captain Sullivan drew a sketch of the tugs as he had observed them and in-

dicated that the Teresa showed three vertical staff lights. (Pl. Ex. 34.)

Defendant attempts to negate the reliability of Captain Sullivan's observations by suggesting that Captain Sullivan could not have seen what he claims. Captain Vercelli of the Teresa testified that the Teresa's lights were turned on approximately while under the bridge. (38.) Defendant contends that Captain Sullivan, who passed the flotilla about 400 yards north of the bridge, could not possibly have seen the lights since he passed the Teresa 400 yards before the lights were turned on. Defendant implies that Captain Sullivan must have become confused with the two vertical lights of the Diana, which admittedly were on, and thus mistook the three lights for the two lights of the Diana.

Although defendant's theory appears plausible, the court must accept the testimony and facts as they are set forth. The slight discrepancy as to when and where the lights of the tug Teresa were turned on by Captain Vercelli and where specifically Captain Sullivan observed them is not enough to discount the positive evidence of Captain Sullivan that he in fact saw *three* white vertical lights.

Furthermore, Roland Sinclair, a seaman and bow lookout for the Boston, admitted observing a short time before the collision a tug with three white lights about a mile ahead and reported this information back to the bridge of the Boston. (Deft. Ex. L, at 279–280, 285.)

Hence, I conclude that the Teresa had on its three white vertical towing lights prior to the time of the collision.

25. While the tug Teresa was placing her intermediate hawser aboard the scows, the tug Diana maintained a heading toward the westerly part of the Verrazano Bridge, well over on the Staten Island side of The Narrows. The Master of the Diana, Captain Sheridan, standing at the wheel in the pilot house of the tug, observed the lights of another vessel ahead about three to four miles away. This proved to be the unbound steamship Boston. At first, Captain Sheridan could see both the red and the green side lights of the Boston; but later, as the Diana and the scows moved closer to the Staten Island shore, only the red side light was visible, along with her white masthead light and range light. The position of these lights indicated to Captain Sheridan that the Boston would eventually pass well clear to port. (63–67, 109.)

26. When the tug Teresa shifted forward on the scow Moran 106, her deck hands passed over to the scowmen a bridle, which was made fast at the bow of the 106, and the main towing hawser of the Teresa was then secured to the bridle. The Teresa thereafter began to let out her hawser to a length of about 350 feet. The tugs and scows were then just about under the westerly part of the Verrazano Bridge on the same heading as before and still drifting with the current, making about three or four knots over the ground. The lights then showing on scow 106 were her red and green side lights atop her cabin aft and a single white light on the yardarm also atop her cabin. The scow 112 was still showing her red and green side lights and the two white horizontal lights hanging from her yardarm, as before. Tugs Diana and Teresa also showed the same lights as before. (13–14, 20, 30, 39, 66–71, 205–209; Pl. Ex. 1; Pl. Ex. 17.)

27. When the tug Teresa commenced to let out her hawser, her Master, Captain Vercelli, radioed the tug Diana, releasing her. Thereupon, the Diana cast off her lines and commenced to back slowly away from scow Moran 112. At the time she was released, the Diana was well over on the westerly side of The Narrows, about underneath the Verrazano Bridge. (66, 87; Pl. Ex. 6.)

28. However, I find that the Diana failed to turn off her two vertical white towing lights upon casting off from the scow 112 and therefore continued to indicate a tow alongside or ahead.

Captain Sheridan admits that after casting off from the scow Moran 112

he failed to turn off the Diana's towing lights, leaving them on until after the collision. He testified that just after the Diana had backed away and let the lines go he looked and saw the Boston about 2000 feet away and heard it issuing a two-blast whistle and then saw it commencing a left turn toward the scow. He immediately went to sound the danger signal and turn on the searchlight to illuminate the tow in the hope that the Boston would see the scows and alter her course. After the accident occurred, Captain Sheridan testified that the Diana was so busy in assisting the scows that he still did not turn off the Diana's towing lights. (67–69, 71–72, 105–106, 112.)

29. By leaving her towing lights on when she cast off the tug, I find that the tug Diana breached Article 1 and Article 2 of the Inland Rules, 33 U.S.C. §§ 171 and 172 respectively, which provide:

*"Time for lights; prescribed lights exclusive (Art. 1)*

"The rules concerning lights shall be complied with in all weathers from sunset to sunrise, and during such time *no other lights which may be mistaken for the prescribed lights shall be exhibited."* (Emphasis supplied.)

*"Lights of steam vessel under way (Art. 2)*

"A steam vessel when under way shall carry—

"(a) On or in front of the foremast, or, if a vessel without a foremast, then in the fore part of the vessel, a bright white light so constructed as to show an unbroken light over an arc of the horizon of twenty points of the compass, so fixed as to throw the light ten points on each side of the vessel, namely, from right ahead to two points abaft the beam on either side, and of such a character as to be visible at a distance of at least five miles.

"(b) On the starboard side a green light so constructed as to show an unbroken light over an arc of the horizon of ten points of the compass, so fixed as to throw the light from right ahead to two points abaft the beam on the starboard side, and of such a character as to be visible at a distance of at least two miles.

"(c) On the port side a red light so constructed as to show an unbroken light over an arc of the horizon of ten points of the compass, so fixed as to throw the light from right ahead to two points abaft the beam on the port side, and of such a character as to be visible at a distance of at least two miles.

"(d) The said green and red side lights shall be fitted with inboard screens projecting at least three feet forward from the light, so as to prevent these lights from being seen across the bow.

"(e) A seagoing steam vessel when under way may carry an additional white light similar in construction to the light mentioned in subdivision (a) of this section.

"These two lights shall be so placed in line with the keel that one shall be at least fifteen feet higher than the other, and in such a position with reference to each other that the lower light shall be forward of the upper one. The vertical distance between these lights shall be less than the horizontal distance.

"(f) All steam vessels (except seagoing vessels and ferryboats) shall carry, in addition to green and red lights required by subdivisions (b) and (c) of this section, and screens as required by subdivision (d) of this section, a central range of two white lights, the afterlight being carried at an elevation at least fifteen feet above the light at the head of the vessel. The headlight shall be so constructed as to show an unbroken light through twenty points of the compass, namely, from right ahead to two points abaft the beam on either side of the vessel, and the afterlight so as to show all around the horizon."

In violation of those rules, the Diana continued to display the towing lights specified by Article 3, 33 U.S.C. § 173 (a), which requires a vessel towing others alongside to carry two white lights in vertical line.

30. At 8:15 P.M. an order was given to the engine room aboard the Boston to reduce speed to half ahead, which would eventually slow the ship to 6½ knots. At that time the Diana, the Teresa and the two scows were on the port bow of the Boston, practically motionless in the water. (15–17, 67, 78–79, 367–368, 379–382, 495; Deft. Ex. S; Pl. Exs. 3, 4.)

31. At approximately 8:17 P.M., just after the tug Diana cast off from alongside scow 112, a two-blast whistle signal was heard from the Boston, which was then approximately one-half mile away broad on the port bow of both the Teresa and the Diana and showing her red side light and range lights well open to the left, as before. At this time, the Teresa had stopped letting out hawser, the length then being approximately 350 feet, and the Diana was approximately 200 feet astern of scow 112. (13–24, 30–33, 67–74, 155, 209–211, 223; Pl. Ex. 29, at 467.)

32. Upon hearing this two-blast whistle signal, both the Diana and the Teresa immediately responded with a danger signal of repeated short blasts on the whistle, and both tugs also promptly turned on their searchlights and played the beams up and down along the row of scows. (13–24, 30–33, 67–74, 209–211, 215–219; Pl. Ex. 29, at 467.)

Although the Boston denies hearing the alleged danger signals from the tugs or any whistle signals at all, this court finds that it is reasonable to believe from the testimony of the witnesses that the danger signals were in fact sounded by the Diana and the Teresa. (16, 30, 32, 72, 215–216.)

33. Nevertheless, the Boston turned sharply and rapidly to her left, heading toward the tugs and scows. The tug Teresa attempted to pull the scows out of the path of the oncoming Boston but, because they were then almost dead in the water, this effort was unsuccessful, and at approximately 8:20 P.M. the bow of the Boston struck the after port side of the scow 106 at almost right angles, resulting in severe damage to both scows and to the Boston as well. (13–24, 141–144, 155; Pl. Exs. 3, 4, 6, 12, 13–15, 18, 19 and 22; Pl. Ex. 20, at 313–314; Pl. Ex. 29, at 469, 480; Pl. Ex. 37; Deft. Ex. C, at 20; Deft. Ex. D; Deft. Ex. K, at 430; Deft. Ex. K–2.)

Defendant disputes the angle at which the Boston struck the scow 106, evidently attempting to minimize the extent of the Boston's left turn. The testimony and other evidence clearly support the finding that the Boston hit the scow 106 almost perpendicularly, at about a 90 degree angle. Two witnesses aboard the Boston, James Bermingham, the radio officer, and Dennis Jewett, a first class cadet at the United States Merchant Marine Academy, drew diagrams which indicated that the collision occurred at approximately a 90 degree angle. (See Deft. Ex. K, at 430; Deft. Ex. K–2; Deft. Ex. C, at 20; Deft. Ex. D.) The photographs of the scow 106 after the collision confirm that the angle of the impact between the scow and the Boston was about 90 decrees. (Pl. Exs. 13–15.)

34. It was at about 8:17 P.M. or three minutes before collision, when the Boston was about a half-mile from the tugs and scows, that her engines were ordered slow ahead and, simultaneously, she sounded two short blasts on her whistle. Without awaiting any response from the tugs, her rudder was put at 20° to port, followed within thirty seconds by an order for full left rudder. Within a minute, or before 8:18 P.M., the Diana's searchlight was seen to be directed on the two scows. Thereafter, the Boston sounded a danger signal of several short blasts on her whistle and at 8:19 P.M. her engines were ordered full astern. At 8:20 P.M. the bow of the Boston struck the port quarter of scow Moran 106. At the moment of collision, Boston's rudder was in the full left

position and she had been turning to port continuously from 8:17 P.M. to 8:20 P.M. (403–404, 408, 415, 419, 471–472, 476–479.)

The Boston's three minute left turn is clearly established by the evidence. Captain Albertson of the Boston testified that the two-blast whistle signal, left turn and slow ahead orders were all practically simultaneous. (477–478.) He testified that the ship was turning left just up to the moment of impact. (479.) He also attempted to minimize the extent of the left turn by saying that the initial 20 degree left rudder order did not commence to take effect for 20 or 30 seconds. (528.) However, this does not conform with his coast guard testimony (479–480, 534) or with the testimony of his mate, Lindsey, who told the coast guard that the Boston began turning left within ten seconds of the first rudder order. (Deft. Ex. J, at 114.)

35. The collision occurred about 1,500 feet south of the Verrazano Bridge on the extreme westerly edge of the channel near the Staten Island shore. (26, 73; Pl. Ex. 5; Pl. Ex. 6.)

When the Master of the vessel Valiente, Captain Sullivan, passed the tugs and barges just north of the Verrazano Bridge, the Moran's vessels were headed toward Craven Shoals Buoy 19A and it is reasonable to believe, with no evidence to the contrary, that they continued in this direction as confirmed by Captain Vercelli of the tug Teresa. (Pl. Ex. 5.) Captain Vercelli, in fact, marked the place of collision right on this course line. Moreover, this position is in close agreement with the position recorded on Captain Albertson's Report of Vessel Casualty (Pl. Ex. 42) which was filed with the coast guard on December 28, 1967, the day following the accident. The position is indicated as being .6 mile bearing 162 degrees from the Verrazano Bridge. If that bearing is taken from the westerly abutment of the bridge, and that is the portion of the bridge toward which the Boston was

headed just prior to or at the time of the collision, according to Captain Albertson (417–420), the point would fall almost exactly on the course line drawn by Captain Vercelli.

36. Within seconds after collision, the tug Diana was back alongside scow 112 and took both scowmen off the barges. The tug Teresa cut her hawser and went back to the scows. Part of their cargo was dumped and thereafter both scows were returned to New York for repairs. (Pl. Ex. 20, at 367; 147, 155, 28–29, 72.)

37. The speed of the Boston at impact was approximately eight knots through the water. (219.)

Captain Albertson of the Boston attempts to place the speed of the Boston at the time of the collision at about three knots. However, this conclusion was based on the assumption that the Boston's engine had been going astern for a full two minutes prior to the collision; whereas we know from Captain Albertson's testimony at the coast guard hearing and from the record in the bridge bell book that the Boston's engine was not put astern until 8:19 P.M., one minute before the time of impact. (473–475, 494–495; Deft. Ex. H, at 20–21.)

Moreover, Captain Albertson conceded that the Boston was fully laden with bulk coal and proceeding at full speed of 10½ knots up until at least 8:15 P.M., five minutes before the collision, at which time the engine was ordered half ahead. Obviously, the Boston had built up considerable momentum and it would have taken some time to reduce the speed.

38. At the time of collision, the two scows were directly astern of the tug Teresa heading to the westward of Craven Shoal Buoy 19A on the westerly edge of the channel, as before, making not more than one or two knots through the water. (18, 27, 54; Pl. Ex. 5.)

It is well established that the scows were proceeding at a very slow speed at the time of the collision. Despite Captain Albertson's contention that they were moving at five knots through the

water (seven knots over the ground adding the two knots current) (421), the evidence overwhelmingly supports the finding that the scows were making about one or two knots through the water. The Boston's radio operator, Bermingham, testified that at impact the tow was moving "very slowly, if it was moving at all." (Deft. Ex. C, at 16.) Moreover, the Moran witnesses are unanimous that the tugs and scows were barely moving at all times. (54, 69, 144, 219–220; Pl. Ex. 29, at 466, 480; Pl. Ex. 20, at 364.) Furthermore, even Captain Albertson admitted that the scows were motionless when the Boston turned left three minutes before the collision. (495.) To have the scows increase their speed to at least five knots through the water in three minutes under the circumstances, as Captain Albertson would like to have us believe, is incredible.

39. I find that the tugs Diana and Teresa and the scows Moran 106 and 112 were on the port side of the Boston and on the westerly Staten Island side of the channel prior to and at the time of the collision.

There is a dispute as to the position of the Diana when she cast off from alongside the scow Moran 112. However, despite the apparent contradiction of the testimony at the trial and at the coast guard hearing, the credible evidence leads this court to find that the Diana was on the westerly side of the channel and on the Boston's port bow when the Boston made its sharp left hand turn into the scows.

*First*, Captain Sheridan of the tug Diana testified that the Diana was at all times during her approach of the Boston on the westerly side of the channel. (62–63.) Captain Sheridan testified as follows:

"Q. Captain, at any time throughout the approach of the Boston was your tug ever on the Boston's starboard bow before the Boston began her left turn?

"A. Never at any time.

"Q. Were the barges at any time on the starboard bow of the Boston at any time before the Boston began her left turn?

"A. No." (78–79.)

*Secondly*, Captain Vercelli of the tug Teresa testified and illustrated by a diagram (Pl. Ex. 5) that the tugs and the scows were on the westerly side of the channel headed towards the Craven Shoals buoy. (27.) This complements Captain Vercelli's testimony that the tugs were headed in a south-southwesterly direction toward the westerly abutment of the Verrazano Bridge. (63.)

*Thirdly*, the testimony of both Captain Sheridan and Vercelli was confirmed by the testimony of an independent witness, Captain Sullivan, the pilot of an outboard steamship, Valiente, which passed the tugs and scows shortly after her departure from Pier 1 in Brooklyn on the night of the accident. Captain Sullivan testified that as the Valiente approached the Moran flotilla from the north, he observed a cluster of lights, which was the two tugs and scows. Captain Sullivan marked the position of this cluster of lights on a chart, a copy of which is plaintiff's Exhibit 33. (Pl. Ex. 31, at 532, 534–535.) This position was clearly on the westerly side of the channel.

In addition, Captain Sullivan testified that from this point where he observed the tugs and scows, they were headed at approximately 190 degrees for Craven Shoals, on the westerly side of the channel. (Pl. Ex. 31, at 551–554.) This coincides with the testimony of Captain Vercelli on the tug Teresa and Captain Sheridan on the tug Diana.

This is further confirmed by the coast guard report on the collision. (Deft. Ex. EE.) The Opinion rendered by the Hearing Examiner of the coast guard inquiry states that when the Boston was a half mile away from the Moran vessels, she was headed in a northerly direction which would pass to the east of the tugs and scows, on the Boston's port bow. (Deft. Ex. EE, at 5.)

Defendant, on the other hand, attempts to establish that when the tug Diana cast off from the scow 112, it was under the Verrazano Bridge on the Boston's *starboard* side of the channel. Defendant uses the inconsistency of Diana's Captain Sheridan's testimony and a hypothetical extension of the mid-channel line to support its thesis. This is not convincing.

Defendant endeavors to impeach the credibility of Captain Sheridan's testimony by contending that his coast guard testimony as to the Diana's position at time of cast off placed the Diana on the *starboard* side of the Boston while his testimony four years later at trial placed the Diana on the *port* side of the Boston. Captain Sheridan admitted that at trial the position he marked on two charts (Pl. Ex. 3 and Deft. Ex. A) as to where the Diana cast off was about 400 feet to the west of the position he marked at the coast guard hearing immediately after the accident. Captain Sheridan ascribed this discrepancy to the difficulty at night of giving a precise position on a chart without first studying it. Also, because of his experience as a pilot, he did not use any particular chart on the night of the collision and therefore the position he marked at the coast guard hearing was only an approximation. Hence, after thinking and analyzing the position more carefully, Captain Sheridan felt the position he marked at trial was more accurate. (94–103, 120.)

Defendant proposes that if the first position which Captain Sheridan marked at the coast guard hearing was correct, then by extending a hypothetical mid-channel line between the east and west channel limits up towards the Verrazano Bridge, the Diana was on the easterly side of the channel and on the starboard side of the Boston.

The court does not accept this reasoning. Even if we were to follow the mid-channel line northward to the position where the Diana cast off as marked by Captain Sheridan at the coast guard hearing, the Diana would only barely be to the east of the mid-channel line. This still however would not put the Diana on the starboard side of the Boston since the defendant alleges that the Boston was well over on her starboard side of the channel in her approach of the Verrazano Bridge. (See Deft. Ex. J–1.)

The defendant also introduced the testimony of Captain Albertson of the Boston (401, 403–404; Deft. Ex. W) and of Mr. Lindsey, a third mate on the Boston (Deft. Ex. J, at 117–118; Deft. Ex. J–2), who contend that the Diana was about 10 degrees off the Boston's starboard bow immediately prior to the collision. The court, however, does not find this testimony as credible as the testimony of Captains Sheridan, Vercelli and Sullivan.

*Lastly*, the defendant appeals to reason and logic in claiming that the Moran's version of the Boston's navigation is just improbable. Defendant argues that if the Boston proceeded on an inbound course without any alteration, she would have left the Diana and the tow safely on the Boston's port bow. Why then for some inexplicable reason did the Boston make a sharp left to the port and head directly toward the scows?

The court cannot answer this question with absolute certainty since the reason the Boston acted in such a way has not been definitely established.[2] Neverthe-

---

2. Plaintiff also cannot explain conclusively why the Boston turned left, but at a post-trial hearing speculated on four possible reasons: (1) Mechanical breakdown, although undetected; (2) The helmsman of the Boston became confused or executed the order improperly, he turned left instead of right. The helmsman demonstrated apparent confusion about left and right at the coast guard hearing; (3)

Two witnesses, the mate and the lookout of the Boston, testified that in the area of the Verrazano Bridge there are many lights along the bridge and along the shore. Good vision is difficult in that area and this is a well-known problem. The members of the Boston's crew may have become disoriented because of that; or (4) The Boston deliberately turned left since she was heading for the anchor-

less, looking at the relevant facts presented, weighing the credibility of the witnesses, and considering the coast guard report and the negligence of the Boston (see findings 43–45), I must conclude that the Diana was on the port bow of the Boston prior to the collision.

40. Even though the Diana after cast off did not turn off her two vertical white lights indicating a tow alongside or ahead (see findings 28–29), I find that these lights could not have misled or confused the Boston.

*First*, Captain Albertson testified that he visually observed the Diana and her scows before the Boston turned left at 8:17 P.M. He testified as follows:

> "Q. Before we broke for lunch you told us that when you blew your two-blast whistle signal you could see on your starboard bow the tug with two lights showing and you could also see the two barges on your starboard bow, and on your port bow you saw a tug with a red light showing, is that correct?
>
> "A. That is correct." (450–451.)

Therefore, it is difficult to conclude that Captain Albertson could have been misled by the Diana's lights.

*Secondly*, seconds after the Boston began her left turn the Diana flashed her searchlight on the scows illuminating and making them visible to everyone on the Boston. (67–68, 71–72, 470–473; Deft. Ex. L, at 290–291; Deft. Ex. J, at 97, 107, 117; Deft. Ex. J–2; Deft. Ex. K, at 433.) At that time the position of the Moran vessels should have been visible. (See Deft. Ex. L, at 294–295; Deft. Ex. L–1; Deft. Ex. K, at 427–428; Deft. Ex. K–1.)

*Thirdly*, the Diana cannot be wholly at fault for not turning off her towing

lights since the situation presents extenuating circumstances. Captain Sheridan testified to the emergency situation, that the moment he had cast off he saw the Boston start her left turn and heard her two-blast whistle signal and attempted at that time to do everything to avoid the imminent collision. Although the Diana violated a technical regulation (see finding 29), under the circumstances the facts exonerate the Diana from any misleading of the Boston.

41. I find that the navigation lights on the scows 106 and 112 displayed at the time of the collision were not visible for at least two miles on a clear night as required by the coast guard regulations.

Plaintiff makes the following contentions:

*First*, plaintiff proposes that the credible evidence sustains the contention that the navigation lights on the scows were being properly displayed. (20, 24, 39, 70, 85, 138–139, 146, 179, 205–206, 214–215, 220; Pl. Ex. 17; Pl. Ex. 18; Pl. Ex. 20, at 318–319, 322, 337–338, 369; Pl. Ex. 23; Pl. Ex. 29, at 466, 469, 481.)

*Secondly*, the coast guard formally inspected the lights on the scows on December 20, 1967, one week before the collision, and at that time found the lights to be in good operating condition and in full compliance with coast guard requirements. (Pl. Exs. 24–28.)

*Thirdly*, an independent expert, Roger Harvey, tested the lights at sea and verified that all of the scow lights were visible on a dark and clear night for a distance of at least two miles, the requirement set by the coast guard. (253–256; Pl. Ex. 38.)

The coast guard requirements read in pertinent part as follows:

> "80.17 Lights for barges and canal boats in tow of steam vessels

---

age off Stapleton, a point on the westerly side of the channel near Staten Island. She turned left and then for the first time observed the tugs and barges to port and attempted to avoid them by continuing hard left in an effort to pass in front of the scow 106 and over the hawser between the tug Teresa and the scow 106.

The Boston's major concern was to get to Stapleton. As Captain Albertson testified, he only used his radar to determine how congested the anchorage was and not to determine the positions of the tugs and the barges. (486–487.) (See minutes of post-trial hearing, April 5, 1972, at 8–10.)

on the Hudson River and adjacent waters and Lake Champlain.

. . . . . .

"(b) Barges and canalboats, when being towed by steam vessels on the waters of the Hudson River and its tributaries from Troy to the boundary lines of New York Harbor off Sandy Hook, as defined pursuant to section 2 of the act of Congress of February 19, 1895 (28 Stat. 672; 33 U.S.C. 151), the East River and Long Island Sound (and the waters entering thereon, and to the Atlantic Ocean), to and including Narragansett Bay, R. I., and tributaries, and Lake Champlain, shall carry lights as follows:

. . . . . .

"(6) The white bow lights for barges and canalboats referred to in this section shall be carried at least 10 feet and not more than 30 feet abaft the stem or extreme forward end of the vessel. On barges and canalboats required to carry a white bow light, the white light on bow and the white light on stern shall each be so placed above the hull or deckhouse as to show an unbroken light all around the horizon, *and of such a character as to be visible on a dark night with a clear atmosphere at a distance of at least 2 miles.*

"(7) When nondescript vessels known as scows, car floats, lighters, barges or canalboats, and vessels of similar type, are towed alongside a steam vessel, there shall be displayed a white light at the outboard corners of the tow." (Emphasis supplied.)

(33 C.F.R. § 80.17(b) (6) and (7).)

*Finally,* plaintiff claims that since the lights were properly displayed, since the night was clear, and since the lights were of requisite strength and quality, the Boston should necessarily have seen the navigation lights of the scows had it not been for the Boston's negligence.

The court cannot accept plaintiff's contentions. All plaintiff demonstrates is that the navigation lights on the scows should have been seen on the night of the collision and not that they were actually visible for the requisite distance of two miles. Furthermore, defendant's evidence, as will be shown, is far more convincing.

The defendant, on the other hand, argues that the credible evidence is overwhelming that the scows were improperly lighted since the lights were not visible for the two-mile distance as required by the coast guard regulations. (124, 163–164, 222, 231–233, 397, 415, 428, 519–520, 533, 538, 540, 548, 550; Pl. Ex. 31; Pl. Ex. 34; Deft. Ex. C, at 8–9; Deft. Ex. J, at 107, 117; Deft. Ex. K at 433, 453; Deft. Ex. L, at 279; Deft. Ex. Q, at 28, figs. 3 and 6.)

*First,* the Boston's captain (397, 415, 428), watch officer (Deft. Ex. J, at 107, 117), radio officer (Deft. Ex. C, at 8–9), engine cadet (Deft. Ex. K, at 433, 453) and bow lookout (Deft. Ex. L, at 279) claim they never saw any lights on the scows either before or after the collision.

*Secondly,* Captain Sullivan, the pilot of the outbound vessel, Valiente, and an independent witness, did not notice any lights. Although he claims using binoculars on "numerous" occasions while the Valiente was approaching the flotilla, Captain Sullivan did not notice or remember noticing any lights on the scows, even when the Valiente was only about 500 feet away from the scows. (Pl. Ex. 31, at 533, 537, 540, and 550.) Captain Sullivan testified at the coast guard investigation (Pl. Ex. 31) in part as follows:

"Q. As you came closer, and thought it was two tugs with the barge, could you distinguish any other navigational lights with the exception of the three white lights on it that you had already mentioned?

"A. Other than the deck lights on the towing boats, I didn't particularly notice any lights. [533.]

. . . . . .

"Q. At that time [when VALIENTE was passing about 500 feet abeam

of the flotilla] did you see any lights on the barges?

"A. I didn't notice. [538.]

"Q. Did you observe any barge lights when you used your binoculars?

"A. I didn't particularly notice.

"Q. You did notice any barge lights?

"A. No.

"Q. Did you use your binoculars on more than one occasion after passing position one [the position where he first sighted tug lights]?

"A. I did.

"Q. How many times did you use them?

"A. Numerous times. [540.]

"Q. When you saw this one large barge you didn't see any navigation lights on it?

"A. I don't remember seeing any." (550.)

*Thirdly*, defendant uses testimony of the Teresa's deckhand, Arnold Nordberg, to support the claim that the lights were not visible. Mr. Nordberg testified that when he was going to rendezvous with the Diana off Pier 25, he did not see the scow 112's white lights until about 200–400 feet away. (222, 231, 233.) Mr. Nordberg, the Teresa's deckhand, testified at the coast guard investigation (read at trial) in part as follows:

"Q. Now, as you were approaching the Diana and her tow at the rendezvous, did there come a time when you saw the barge lights for the first time?

"A. I spotted the lights before we came up to them and I spotted the two white lights on the after barge which was the 112.

"Q. As you were approaching for the rendezvous?

"A. Yes.

"Q. And could you give us an estimate of the distance that you were from the barge, the after barge when you spotted her lights?

"A. Well, it could have been about 200, 300 feet.

"Q. And prior to that were you looking for the barges, were you?

"A. We were, yes." (231–232.)

*Fourthly*, defendant's independent light witness, Theodore Projector, attempted to establish on the basis of his tests that even under optimum conditions, all of the white lights on the scows and the red light on the scow 106 were visible at less than ⅔ of a sea mile, and the scow 112's red light was visible at about 1.5 sea miles or less, at zero to 2 elevation. (Deft. Ex. Q, at 28 and fig. 3.)

Dr. Projector's report contradicts plaintiff's light expert, Roger Harvey. Defendant contends that one of the major reasons for Harvey's different result is because Harvey made his tests with different batteries than those being used at the time of the collision. The batteries used at the time of the collision were allegedly of less strength and therefore would have substantially degraded the visibility of the lights used in the experiment. (See Deft. Ex. Q, fig. 6; 330.)

Defendant elicited at trial that the batteries on the scows were not frequently changed. The batteries in the 106's white lights displayed at the time of the collision had been used anywhere from 32–128 hours. The four 1.5 volt batteries in one of the 106's white lights had been changed two to three weeks before the collision and the four 1.5 volt batteries in the other white light on the 106 about one to two months before the collision. (180–183.) However, the scow 106 captain did not know which of these white lights was being displayed on top of the cabin of the 106 at the time of the collision. (183–184). Since the white lights had been used on an average of about 16 hours per week prior to the collision (188–190), therefore at the time of the collision, the batteries in one of the white lights had been used 32 to 48 hours, while the batteries in the other lights had been used 64 to 128 hours.

The battery used with the scow 106's red and green lights had not been changed for one year. (176.)

The batteries in the scow 112's two white lights displayed at the time of the collision had been in use for at least 170 hours. The four 1.5 volt batteries in the 112's white lights had not been changed for at least four months prior to the collision. (Pl. Ex. 20, at 333.) The white lights on the 112 had been used on an average of between seven to seventeen hours per week prior to the collision (Pl. Ex. 20, at 356) and therefore at the time of the collision, the batteries in these lights had been used for at least 170 hours.

Using this information together with the impact of the use of batteries on the intensity of light (see Deft. Ex. Q), Dr. Projector concluded that the light output of the white lights on the scow 112 was decreased on the basis of the batteries alone at least by 40% at the time of the collision, and that the output of white lights on the scow 106 was decreased by at least 20% and possibly by 35% at the time of collision, depending on which white light was in use (the answer to which the Moran did not know).

Moreover, Dr. Projector claims that there was no evidence in Harvey's test as to the wattage of the bulbs in the red and green lights he tested and the voltage of batteries and amperage of bulbs in the white lights.

Dr. Projector concludes that even under the most favorable conditions the navigation lights in the scows were not visible for two miles at the time of the collision.

*Fifthly*, defendant contends that the reason the navigation lights were not seen might have been because the cargo on the scows 106 and 112 was piled close to the lights and higher than the top of the scows' cabins on which their navigation lights were located. Both factors allegedly contributed to those lights being obscured from the Boston's view on the night of the collision. (124, 163–164, 519–520.)

Captain Torkelsen of the scow 112 testified that the fly-ash aboard his scow was piled six or seven feet above the deck, which would be just about the height of the cabin at the end of the scow. (Pl. Ex. 20, at 35.) The height of the cabin was about seven to seven and one-half feet. (163). Captain Poesl of the scow 106 testified that the celler dirt aboard his scow was piled up to about eight or nine feet above the deck of his scow and the closest distance from the cargo on the scow 106 to the red and green lights was approximately ten feet. (124, 163–164.) This would confirm Captain Vercelli's testimony of the tug Teresa who put the total height of the cargo of the scow 112 at not more than 11½ feet above the waterline (the deck was about two and one-half feet above water). (52.) Admittedly then from the testimony of Captain Poesl of the scow 106, the cargo was piled about one or two feet higher than the top of the cabin in certain areas along the scow. Captain Poesl also testified that the scow 106's lights were located about one foot higher than the top of the cabin. (124.) Therefore, the cargo must necessarily have been at least the same height or a little higher than the navigation lights on top of the cabin on the end of the scows 106 and 112 at the time of the collision.

Moreover, since the cargo of debris on board the scows was admittedly piled within three-four or ten feet of the navigation lights (52, 164) and considering the northwesterly breeze and the natural movement of the air due to the movement of the scows through the water, it is reasonable to assume that the lenses on the lights to some extent could have had small particles of the cargo on them at the time of the collision, thereby reducing the light transmitted through the lens.

Hence, the height of the cargo and the particles of cargo on the lenses are factors which may help to explain why the Boston's men did not see the scows 106's and 112's lights before the collision.

Plaintiff, however, proposes that regardless of the height of the cargo, the port side lights of the scows and the white lights atop the cabin of the scows must have been visible to the Boston. Plaintiff offers no evidence to substantiate this claim.

*Lastly,* plaintiff produced no witnesses who could say the navigation lights were actually visible for two miles. Captain Vercelli, Captain Poesl, Captain Torkelsen and Mr. Nordberg all testified that the lights were fully visible but they were at distances substantially less than one mile. (See 20, 46, 139, 170–172, 222; Pl. Ex. 20, at 356.)

Hence, the court concludes that the navigation lights on the scows 106 and 112 were not visible for the required two-mile distance under coast guard regulations.

42. Although the navigation lights on the scows 106 and 112 were not visible for the required two-mile distance thus constituting a violation of a statutory regulation, I find that the lights were visible at a distance less than two miles and the scows were seen by the Boston in time to avoid the collision.

*First,* Captain Albertson testified that he saw the two barges when he made his sharp left turn. (450–451.)

*Secondly,* after the Boston's left turn, the Diana flashed her searchlight on the scows illuminating and making them visible to everyone on the Boston. (67–68, 71–72, 470–473; Deft. Ex. L, at 290–291; Deft. Ex. J, at 97, 107, 117; Deft. Ex. J–2; Deft. Ex. K, at 433.)

*Thirdly,* the tug Teresa's lights indicated a tow astern. So even if the scows' lights were not visible for two miles, the Boston should have known that barges were in tow astern of the Teresa.

The lights of the scows 106 and 112 were visible for a distance of less than two miles but the dimness of these lights under the circumstances was not a contributing factor to causing the collision.

43. I find the Boston negligent in failing to use her radar to discover exactly where the tugs and scows were located on the night of the collision.

Admittedly there was confusion among the crew members of the Boston as to the position of the scows and tugs before the accident. Captain Albertson testified that he never saw the sidelights of the Diana. (436.) Mate Lindsey testified that he did not see the red sidelights of the Diana until thirty seconds before the collision (Deft. Ex. J, at 116) and lookout Sinclair testified that he did not see the sidelights until the Diana was very close. (Deft. Ex. L, at 279, 283.) Consequently, those in charge of the Boston may not have ascertained in which direction the tugs and scows were heading, as Captain Albertson confirmed. (503.) Hence, in this type of situation amidst confusion the use of radar was essential to detect precisely where the tugs and scows were and the course and speed of the Moran flotilla. Unfortunately, Captain Albertson failed to use the radar for this purpose. His testimony in pertinent part is as follows:

"Q. When you saw the lights of these vessels ahead of you, did you look at the radar?

"A. I didn't look at the radar to especially observe these vessels, I was looking in the radar to see how congested the anchorage was.

"Q. Did you use the radar at all again from the time of 1954 until the time of the collision to establish any position of the vessels ahead of you, the ones that were south of the Verrazano Bridge?

"A. I didn't use it for that purpose, no, sir." (486–487.)

Regardless of how clear the night was, the visibility could have been obscured by various factors. Radar would have revealed and clarified the situation. The Boston was negligent in not using radar for this purpose.

44. I find that the Boston was proceeding at an excessive and immoderate speed after first sighting an unclear cluster of lights about three-four miles

ahead. The Boston did not reduce her speed to half ahead until five minutes before the collision (see finding 30) and the Boston's engines were not put full astern until only one minute before the collision (see finding 34).

45. I find that the Boston failed to maintain a proper and effective lookout.

Even though the evidence demonstrates that the Boston had a bow lookout, Captain Albertson testified that he did not receive a report as to the Diana and the Teresa. (392, 429.) Contrary to Captain Albertson's testimony, the lookout of the Boston, Sinclair himself, testified that he did report the sighting of the lights on a tug ahead (Deft. Ex. L, at 278, 285.) Apparently there was a lack of communication between the lookout and those in charge of the vessel and the whole purpose of a lookout was nullified.

Those in charge of the Boston claim that they heard no whistle signals, saw no lights on the two scows, and observed no lights on the Teresa until after the collision. However, this is contradicted by all those in charge of the Moran's tugs and scows and by Captain Sullivan of the Valiente, as to the positive testimony of lights on the Teresa. Furthermore, the Boston's radioman, Bermingham, testified that he heard a danger signal from one of the tugs prior to the collision. (Deft. Ex. C, at 13.)

Considering the testimony and the facts, I conclude that the lookout on the Boston was not adequate and did not fulfill its required purpose.

46. I find that the Boston failed to sound a danger signal when she could not ascertain the course of the tugs and the scows ahead prior to her left turn.

Captain Albertson of the Boston admitted that the first danger signal on the Boston was not sounded until the Boston was full astern at 7:19 P.M., only one minute before the collision. (504.) From the testimony, Captain Albertson appeared not to comprehend that Rule 3 of Article 18 of the Inland Rules required an approaching vessel to immediately sound a danger signal when she fails to understand the course or intention of the other vessel (see discussion, *infra*).

47. In summary I find that the tug Diana and the two scows 106 and 112 violated statutory regulations by using improper lights, that the tug Teresa was displaying proper towing lights, and that the Boston was negligent by traveling at an excessive and immoderate speed under the circumstances, in failing to maintain a proper and effective lookout, and by not using her radar for the purpose of detecting an unclear situation ahead.

Furthermore, I find that the Moran's vessels were on the westerly side of the channel prior to the collision and that the Boston crossed to the westerly side of the channel and struck the scow 106.

## DISCUSSION

I. The Statutory Violations by the Tug Diana and the Scows 106 and 112 Did Not Contribute to the Collision

In findings 28, 29 and 40 I found that even though the tug Diana violated 33 U.S.C. §§ 171 and 172 (Arts. 1 and 2 respectively) by not turning off her two vertical white lights, indicating a tow alongside or ahead, after she cast off from the scows, these lights did not mislead or confuse the Boston.

In findings 41–42 I found that although the scows 106 and 112 violated a coast guard regulation, 33 C.F.R. § 80.17 (b) (6) and (7), by not having their navigation lights visible for the required two-mile distance on a clear and dark night, these lights were visible for various distances less than two miles and at the moment of the Boston's left turn and the scows were seen by the Boston in sufficient time to avert the collision.

Consequently, these two statutory violations by the tug Diana and the scows 106 and 112 could not have caused the accident. The causes were the negligence of the members of the Boston's crew who observed the tugs and scows at least three minutes before the accident and should have avoided the colli-

sion. If it had not been for the Boston's excessive speed under the circumstances, her failure to slow down and stop, her improper lookout, her failure to use radar, and her violations of 33 U.S.C. §§ 203 and 210 (*infra*), the accident could not have occurred.

 The law supports this conclusion. It is well established that a technical light violation is not sufficient in itself to impose liability unless there is a causal relationship between the violation and the collision. See Trinidad Corporation v. Indian Towing Co., Inc., 293 F.2d 107, 110 (5th Cir. 1961); The Smoot Sand and Gravel Corporation v. Baltimore Steam Packet Co., 250 F.2d 422, 424 (D.C.Cir. 1957); P. Dougherty Co. v. United States, 168 F.2d 464, 466 (2d Cir. 1948); Lind v. United States, 156 F.2d 231, 233 (2d Cir.), reh. denied, 156 F.2d 234 (1946); The Transfer No. 8, 25 F.2d 628, 629 (2d Cir. 1928); The Lizzie M. Walker, 3 F.2d 921, 922 (4th Cir. 1925); Savoie and National Marine Service, Inc. v. Apache Towing Co., Inc., 282 F.Supp. 876, 879 (E.D.La.1968); In re Cenac Towing Co., Inc., 276 F.Supp. 317 (E.D.La.1967), aff'd, 404 F.2d 698 (5th Cir. 1968); Greenville Gravel Co. v. Illinois Farm Supply, 215 F.Supp. 560, 563 (N.D.Miss.1963), aff'd, 336 F.2d 494 (5th Cir. 1964); Petition of Texaco, Inc., 210 F.Supp. 390, 394 (S.D.N.Y. 1961), aff'd, 309 F.2d 739 (2d Cir. 1962); Avila v. The Madonna Di Trapani, 122 F.Supp. 272, 275 (D.Mass.1954); The Euryades, 287 F. 354 (S.D.N.Y.1922). In The Lizzie M. Walker, *supra*, a case similar to this one, the court said:

"The unexplained close and obviously dangerous approach of the steamer to the tug with no reduction of speed, the disregard of the tug's towing lights, the course of the steamer astern of the tug, the right angle collision with the scow taken together, show a reckless disregard of the rules of safety on the part of the steamer. This recklessness, and not the absence of another light on the scow, brought about the collision. The fault of the steamer being so gross, and so manifestly the cause of the collision, any doubt of the contribution of the fault of the tug for the collision should be solved in its favor. The Victory & The Plymothian, 168 U.S. 410, 423, 18 S.Ct. 149, 42 L.Ed. 519; The Umbria, 166 U.S. 404, 409, 17 S.Ct. 610, 41 L. Ed. 1053." 3 F.2d at 922.

When an approaching vessel in fact sees unclear lights ahead and has sufficient time to take precautions to avoid a collision, but does not, courts have repeatedly held that this negligent action exonerates otherwise blameless vessels for showing improper lights or no lights at all, when these lights do not cause the collision. See Tide Water Associated Oil Co. v. The Syosset, 203 F.2d 264, 269 (3d Cir. 1953); Van Camp Sea Food Co., Inc. v. Di Leva, 171 F.2d 454, 456 (9th Cir. 1948); The West Point, 85 F. 2d 63 (2d Cir. 1936); The Redwood, 81 F.2d 680 (9th Cir. 1936). The court in Tide Water Associated Oil Co. v. The Syosset specifically commented on this type of situation and said:

"The failure to carry proper lights will not render a vessel at fault when she was in fact seen by the other in time to have avoided the collision and the other thereafter fails to take proper avoiding action." 203 F.2d at 269.

Furthermore, it is significant that the Hearing Examiner of the coast guard in the proceedings against Captain Albertson immediately following the collision found as a fact that the collision was not due to the alleged statutory violations of the tugs Diana and Teresa and scows 106 and 112. (See Deft. Ex EE, at 10.) In his written opinion the Hearing Examiner concluded:

"The indispensable prerequisite of intelligent action to avoid collision is knowledge of the character and course of the vessel with which collision is threatened, and if one vessel is approaching another whose movements or character are uncertain, she is bound to stop until the course and make up of that vessel is ascertained with certainty. The New York, (1899) 175 U.S. 187, 205 [20 S.Ct. 67, 44 L.Ed.

126]. That other vessel's position has not been ascertained unless her course as well as her momentary location is known. The El Monte, (D.C.N.Y. 1902) 114 F. 796. A navigator who, rather than stop, attempts to steer away from a vessel which, because her lights present a confusing or incomplete picture, is on an uncertain course or is engaged in some uncertain undertaking, does so at his own risk. See Willis vs. Tugs Tramp and Mars (U.S.D.C., E.Dist.Va., 1962) 216 F. Supp. 901.

"In my opinion, therefore, Captain Albertson should now be faulted because after having seen these unidentified lights he continued on ahead for some 18 minutes at full speed ahead, then reduced only to half speed ahead for two minutes and then reduced only to slow speed ahead for two minutes before, when it was much too late, finally trying to bring his vessel to an emergency stop. In my opinion, when he saw almost dead ahead an unidentified vessel whose course or heading he could not determine, but which apparently had some tows either alongside or ahead, the location and number of which he could not determine, it was his responsibility to at least promptly reduce the speed of his vessel to a speed at which he could, if necessary, bring his vessel to a stop well before reaching that vessel or her tow. The fact that at the time of the collision the barge that his vessel struck was, in fact, a couple of hundred feet from and not being towed by this unidentified vessel is, I think, not a defense in these proceedings. . . ." (Deft. Ex. EE, at 6–7.)

Despite the statutory violations by the *Diana* and the *scows 106* and *112* in the use of improper lights, these lights were not a cause of the collision and cannot render the Moran vessels liable. The law as I have just demonstrated does not impose liability merely because a statute was violated. The violation must be a proximate cause of the collision and in this situation it was not.

### A. *The Pennsylvania Rule*

Defendant contends that under the standard set up by the Supreme Court in The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873), the Moran's vessels must be held at fault for the collision. Defendant's contention is erroneous in this action.

In *The Pennsylvania* a sailing bark collided with a barge steamer. An act of Congress required that sailing vessels under way should use a foghorn and when not under way should use a bell. The sailing bark, although barely underway, rang a bell rather than using a foghorn and thus technically violated the statute. The standard devised by the court said that where a vessel has committed a positive breach of a statute she must not only show that "her fault might not have been one of the causes, or that it probably was not, but that it could not have been." *Id.*, 86 U.S. at 136. Courts have uniformly followed this standard. See, e. g., Waterman Steamship Corporation v. Gay Cottons, 414 F. 2d 724, 736 (9th Cir. 1969); Commercial Transport Corporation v. Martin Oil Service, Inc., 374 F.2d 813, 819 (7th Cir. 1967); Diesel Tanker F. A. Verdon, Inc. v. Stakeboat No. 2, 340 F.2d 465, 468 (2d Cir. 1965); Topor-Taparek v. Socony Mobil Oil Co., 339 F.2d 792 (2d Cir. 1964); Gary v. United States Oil Screw Echo, 334 F.2d 199, 201 (4th Cir. 1964); The Andros Shipping Co., Ltd. v. Panama Canal Company, 298 F.2d 720, 727–728 (5th Cir. 1962); Afran Transport Co. v. The Bergechief, 274 F.2d 469, 473–474 (2d Cir. 1960); Sinclair Refining Co. v. The Morania Dolphin, 272 F.2d 192 (2d Cir. 1959).

In applying the *Pennsylvania* rule to a collision which involved the improper lighting of a vessel, a statutory violation, the Ninth Circuit in Pacific Tow Boat Co. v. States Marine Corp. of Delaware, 276 F.2d 745 (1960) articulated

more clearly the burden upon the statutory offender in proving that the improper lights "could not have" contributed to the collision. The court said:

> "The words 'could not have,' as used in this rule [Pennsylvania rule], do not require the vessel guilty of a statutory fault to prove that its fault could not by any stretch of the imagination have had any causal relationship to the collision no matter how speculative, improbable, or remote. Seaboard Tug & Barge, Inc. v. Rederi, AB/DisA, 1 Cir., 213 F.2d 772, 775. But they do cast upon such vessel the burden of establishing that the violation could reasonably be held to have been a proximate cause of the collision. States Steamship Co. v. Permanente Steamship Corp., supra, 231 F. 2d at page 87 [231 F.2d 82 (9th Cir. 1956)]." Pacific Tow Boat Co. v. States Marine Corp. of Delaware, 276 F.2d at 749. [Emphasis supplied.]

Under the strict application of the *Pennsylvania* rule, I conclude that the plaintiff in this situation sustained its burden of proof in showing that the statutory violation was not a proximate cause of the collision.

*First*, the Diana's towing lights could not possibly have caused the collision. This court found (see finding 39) that the Diana was on the westerly side of the channel and on the port bow of the Boston prior to the collision. Thus, all that the Diana's towing lights could have indicated was that it had a tow alongside or ahead and it was on the port bow of the Boston. The Boston should have continued straight ahead in her path and kept to her easterly side of the channel. The Diana's lights could not have been a cause of the collision.

*Secondly*, the dimness of the scows 106's and 112's navigation lights also could not have contributed to the collision. The court found (see finding 24) that the tug Teresa was displaying proper towing lights which indicated a tow astern. This fact in itself should have given notice to the Boston of the approximate position of the scows re-

gardless of whether the Boston physically observed them from the statutory requirement of two miles away. Moreover, the Boston did observe the scows at least three minutes before the collision. Furthermore, the scows were on the westerly side of the channel and on the port bow of the Boston. All the Boston had to do was to continue straight ahead and remain on her easterly side of the channel. The statutory violation of improper lighting on the scows 106 and 112 could not have contributed to the collision.

## II. The Boston Violated 33 U.S.C. § 203

### A. *Rule 1, Art. 18, 33 U.S.C. § 203*

■ The Boston was at fault by violating certain statutory regulations which were a proximate cause of the collision. The Inland Rules provide that if a vessel wishes to pass another vessel starboard to starboard she "shall immediately give two short and distinctive blasts of her whistle, which the other vessel shall answer promptly by two similar blasts of her whistle." Rule 1, Art. 18, 33 U.S.C. § 203. Here, the tug Diana and the tug Teresa responded not with the two blasts of assent but rather with the *danger signal* which is required when one vessel considers the other vessel's proposal dangerous. See, e. g., Esso Standard Oil Co. v. Oil Screw Tug Maluco I, 332 F.2d 211 (4th Cir. 1964); Esso Standard Oil Co. v. The President Garfield, 279 F.2d 540 (2d Cir. 1960); National Motorship Corp. v. United States, 171 F.2d 413 (2d Cir. 1948); James McWilliams Blue Line v. Card Towing Line, 168 F.2d 720 (2d Cir. 1948); City of Los Angeles v. Standard Transportation Co., 32 F.2d 988 (9th Cir. 1929); Transfer No. 10, 137 F. 666 (S.D.N.Y.1904).

After the Boston received no assent to her starboard-to-starboard proposal, but to the contrary was warned of a perilous passing, she persisted in her left turn. Courts have constantly condemned such behavior. In Marshall Field & Co. v. United States, 48 F.2d 763 (2d Cir. 1931), the court upheld the lower court

and affirmed the necessity of a vessel waiting for a similar two-blast whistle of assent before turning left for a starboard-to-starboard passing. The court said:

> "When a vessel signals for a starboard to starboard passing, she, in effect, merely extends an invitation for an agreement thereto to the other vessel. Yamashita Kisen Kabushiki Kaisha v. McCormick Inter. S.S. Co. [9 Cir.] 20 F.2d 25; The New York [6 Cir.] 86 F. 814. If the other steamer fails to assent, or if the course of the latter is uncertain, the signaling vessel is bound to stop. The New York, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126; The Munaires [2 Cir.] 1 F.2d 13; A. H. Bull S.S. Co. v. U. S. [2 Cir.] 34 F.2d 614, 616. As was said by the Court of Appeals of this circuit: '*A vessel which has signaled by two blasts that she intends passing to starboard instead of to port, and gets no assenting response, is in duty bound to stop, reverse, and, if necessary, come to a standstill, until the course of the other vessel has been ascertained with certainty, and the risk of collision removed.*' The Munaires, 1 F.2d 13, 15. See also The Bilbster [2 Cir.] 6 F.2d 954; The Sabine Sun [3 Cir.] 33 F.2d 42." Marshall Field & Co. v. United States, *supra*, at 766. [Emphasis added.]

In Compania Punta Alta, S.A. v. Dalzell, 102 F.Supp. 391 (S.D.N.Y. 1952) that court said:

> "The law is well settled that a vessel proposing either a port-to-port or starboard-to-starboard passing must wait upon the other vessel's assent before she changes her course. City of New York v. American Export Lines, Inc., 2 Cir., 1942, 131 F.2d 902; Marshall Field & Co. v. United States, 2 Cir. 1931, 48 F.2d 763." Compania Punta Alta, S.A. v. Dalzell, *supra*, at 397.

See also Red Star Towing & Transportation Co. v. Tug Catherine, 305 F. Supp. 639, 643 (S.D.N.Y.1969), aff'd, 431 F.2d 641 (2d Cir. 1970); Moore-McCormack Lines, Inc. v. S.S. Portmar, 249 F.Supp. 464 (S.D.N.Y.1966).

Hence, under the *Pennsylvania* rule the heavy burden of proof is on the defendant to demonstrate that this statutory violation of the Boston by turning port for a starboard-to-starboard passing without waiting for an assent signal "could not have" contributed to the collision is on the defendant. The Boston did not sustain this burden.

### B. *Rule 3, Art. 18, 33 U.S.C. § 203*

■ The Boston was likewise negligent and at fault for failing to sound the danger signal when she admittedly did not understand the course or intention of the tugs and scows ahead prior to her port turn. This failure violates 33 U.S.C. § 203, Art. 18, Rule 3, which reads as follows:

> "Rule III. If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle."

■ Courts have strictly enforced this rule and held that if a vessel does not receive an answer to its two-whistle blast for a starboard-to-starboard passing or is unsure of the situation of the vessels ahead, that vessel is under an obligation to sound the danger signal. See Tide Water Associated Oil Co. v. The Syosset, 203 F.2d 264, 267–268 (3d Cir. 1953); James McWilliams Blue Line v. Card Towing Line, 168 F.2d 720, 721–722 (2d Cir. 1948); Socony Vacuum Transp. Co., Ltd. v. Gypsum Packet Co., Ltd., 153 F. 2d 773, 777 (2d Cir. 1946); The Richard J. Barnes, 111 F.2d 294, 295–296 (2d Cir. 1940); The E. J. Berwind, 74 F.2d 705 (2d Cir. 1935); Mistich v. M/V Letha C. Edwards, 219 F.Supp. 22, 24 (E.D.La. 1963). See also Deep Sea Tankers v. The Long Branch, 258 F.2d 757 (2d Cir. 1958), cert. denied, 358 U.S. 933, 79 S.Ct. 316, 3 L.Ed.2d 305, reh. denied, 359 U.S. 921, 79 S.Ct. 578, 3 L.Ed.2d 583 (1959).

Moreover, the burden of proof rests upon the vessel initiating the starboard-to-starboard passing to show that the statutory violation could not have contributed to the collision. The Dauntless, 3 F.2d 529 (2d Cir. 1924); Harbor Towing Corp. v. Tug Reliance, 211 F. Supp. 896 (E.D.Va.1963).

Here, however, I cannot say that if the Boston had merely sounded the danger signal when she should have under the statutory regulations, that the collision would not have occurred. The danger signal probably would not have given the Moran's vessels any further notice or indication of the Boston's course or intentions. Moreover, the Moran's vessels were proceeding in a direction well out of the path of the approaching Boston. Hence, compliance with the requirement to issue a danger signal by the Boston most likely would not have prevented the collision.

### C. Art. 27, 33 U.S.C. § 212

■ The defendant proposes that this collision was a situation of special circumstances under Article 27 of the Inland Rules, 33 U.S.C. § 212, and that the Boston was excused from complying with Article 18 of the Inland Rules, 33 U.S.C. § 203, that the two-blast whistle signal be answered before turning left. Article 27 of the Inland Rules is as follows:

> "§ 212. *Special circumstances requiring departure from rules* (Art. 27)
>
> "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

■ Courts have uniformly been reluctant to apply the special circumstances exception. As the Supreme Court said in The Albert Dumois, 177 U.S. 240, 20 S.Ct. 595, 44 L.Ed. 751 (1899):

> "Exceptions to the general rules of navigation are admitted with reluctance on the part of the courts, and only when an adherence to such rules must almost necessarily result in a collision . . .." *Id.* at 249–250, 20 S.Ct. at 599.

Courts are even more reluctant to grant exceptions to specific navigation rules when the situation and the danger are brought about by the fault of the violating vessel. See Northern Transportation Co. v. Davis, 282 F. 209, 211 (2d Cir. 1922); The Sulphite, 73 F.Supp. 137, 140 (E.D.Mich.1947). In fact, the heavy burden of proof is on the offending vessel to show not merely that departure from navigation rules might not have been one of the causes of collision, or that it probably was not, but that it could not have been. See Merritt-Chapman & Scott Corp. v. Cornell S.S. Co., 265 F.2d 537 (2d Cir. 1959); The Piankatank, 87 F.2d 806 (4th Cir. 1937).

The defendant in this case clearly has not sustained that burden. If the Boston had obeyed Article 18 of the Inland Rules by waiting for an appropriate whistle response from the Moran's tugs before turning left for a starboard-to-starboard passing, the collision would not have occurred. There was no special circumstance situation warranting the use of Article 27 of the Inland Rules to excuse defendant's action.

### III. The Boston Violated 33 U.S.C. § 210

■ The Boston also violated another statutory regulation by proceeding well over to the westerly and port side of the channel. Article 25 of the Inland Rules, the Narrow Channel Rule, provides in pertinent part as follows:

> "§ 210. *Steam vessel in narrow channel (Art. 25)*
>
> "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

This rule has been held applicable to The Narrows in New York Harbor. Det

Forenede Dampskibs-Selskab, A/S v. The Excalibur, 112 F.Supp. 205 (S.D.N.Y. 1953), aff'd, 216 F.2d 84 (2d Cir. 1954).

Since there were no other vessels in the area except for the two tugs and the two scows to prevent the Boston from navigating a straight ahead course on her starboard side of the channel, I can find no reason why it was not "safe or practicable" to do so.

Courts have rigidly enforced this rule as an important safety regulation. The Victory and The Plymothian, 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519 (1897); Marshall Field & Co. v. United States, 48 F.2d 763 (2d Cir. 1931); Red Star Towing & Transportation Co. v. Tug Catherine, 305 F.Supp. 639 (S.D.N.Y.1969), aff'd, 431 F.2d 641 (2d Cir. 1970). Furthermore, since there is a statutory violation, the heavy burden of proof under the *Pennsylvania* rule is placed on the Boston to show that this violation "could not have" contributed to the collision. See Matton Oil Transfer Corporation v. The Greene, 129 F.2d 618 (2d Cir. 1942), Diesel Tanker F. A. Verdon, Inc. v. The All American, 127 F.2d 421 (2d Cir. 1942); Red Star Towing & Transportation Co. v. Tug Catherine, *supra*.

Again, I must conclude that there were no special circumstances in this particular situation that would excuse the Boston's conduct in violating the Narrows Channel Rule.[3]

### IV. Negligence of the Boston

#### A. *Failure to Slow Down or Stop*

■ The Boston was negligent in proceeding at excessive speed immediately prior to the collision and this was a proximate cause of the collision. The Boston was at fault for failing to slow down or stop in sufficient time to avoid the collision.

In these circumstances the Boston was under a duty when she observed an unclear situation ahead to slow down and if

necessary stop in order to ascertain what vessels were approaching and where they were headed. As the Supreme Court said in The New York, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126 (1899):

> "If she were unable to see the colored lights of the approaching steamer, it was her duty to stop until she made them out, or otherwise determine the identity and course of the approaching vessel."

> . . . . . .

> "The lesson that steam vessels must stop their engines in the presence of danger, or even of anticipated danger, is a hard one to learn, but the failure to do so has been the cause of the condemnation of so many vessels that it would seem that these repeated admonitions must ultimately have some effect. We cannot impress upon the masters of steam vessels too insistently the necessity of caution in passing or crossing the course of other vessels in constricted channels." The New York, *supra*, at 205, 20 S.Ct. at 74.

See Nelson v. Leland, 22 How. 48, 63 U.S. 48, 55, 16 L.Ed. 269 (1859); Federal Insurance Co. v. S. S. Royalton, 312 F.2d 617, 676 (6th Cir. 1963); A. H. Bull S. S. Co. v. United States, 34 F.2d 614, 616 (2d Cir. 1929); The Buenos Aires, 5 F.2d 425 (2d Cir. 1924); The Munaires, 1 F.2d 13, 15 (2d Cir. 1924).

#### B. *Improper Lookout*

■ The Boston was negligent for failing to maintain a proper lookout and this was a proximate cause of the collision. Had the Boston seen what should have been visible to her and heard what should have been audible to her, she would not have turned left and would have avoided the collision.

The law in admiralty provides that "the positive evidence of persons on the ship who were in a position to see, and who did see, the lights of the ship, is en-

---

3. This, however, is not to say that special circumstances cannot exist under different conditions. See United States v. The J. A. Cobb, 182 F.Supp. 234 (S.D. N.Y.1959), aff'd, 283 F.2d 754 (2d Cir. 1960); Compania Punta Alta, S. A. v. Dalzell, 102 F.Supp. 391 (S.D.N.Y.1952).

titled to greater weight than that of mere negative witnesses who were on another vessel and who did not see the lights." The Buenos Aires, 5 F.2d 425, 430 (2d Cir. 1924). See also The Thingvilla, 48 F. 764 (2d Cir. 1891).

In The Richmond, 114 F. 208 (E.D.Va. 1902), the court said:

> "This positive testimony by those on the schooner, in a position to see the lights, and know of their condition, will not be lightly rejected because other persons, whose duty it was to have seen them, either failed to observe or happened not to see them. Negative evidence of this character cannot be accepted to outweigh positive evidence. The failure to observe a light cannot be said to disprove its existence." The Richmond, *supra*, at 211.

■ The same rule applies to unheard whistle signals. In The Fin MacCool, 147 F. 123 (2d Cir. 1906), the court said:

> "The case is one for the application of the rule of evidence that positive evidence is ordinarily to prevail over strictly negative evidence, and that when one or more witnesses testify that they saw an object or heard a signal upon a given occasion, their testimony is to prevail over that of a same number of witnesses, of equal candor, who testified that they did not see or hear it." The Fin MacCool, *supra*, at 127.

■ The rule of maintaining a proper and efficient lookout is one of strictest requirements in the law of admiralty. See Sun Oil Co. v. S. S. Georgel, 245 F. Supp. 537 (S.D.N.Y.1965), aff'd, 369 F.2d 406 (2d Cir. 1966); Grace Line, Inc. v. United States Lines Co., 193 F. Supp. 664 (S.D.N.Y.1961), aff'd, 302 F. 2d 933 (2d Cir. 1962). In fact, this requirement is at times so crucial that some courts have held it to be tantamount to a statutory fault standard therefore imposing the heavy burden of establishing that her fault "could not have" contributed to the collision. The Madison, 250 F. 850, 852 (2d Cir. 1918).

### C. *Lack of Use of Radar*

■ The Boston was negligent for not using her radar for the proper purpose and this was a proximate cause of the collision. The Boston admittedly was confused as to what vessels were ahead. If the Boston had used the radar for detecting where exactly the tugs and the scows were and in what direction they were headed, the collision would not have occurred.

■ The law places on the approaching vessel an affirmative duty to use radar when the situation ahead is unclear or confusing. As the Second Circuit said in Afran Transport Co. v. The Bergechief, 274 F.2d 469 (2d Cir. 1960):

> "If a vessel carries properly functioning radar equipment and she is in or approaching an area of known poor visibility, there is an affirmative duty to use the radar." Afran Transport Co. v. The Bergechief, *supra*, at 474.

Although *The Bergechief* involved a collision in fog, the rule has been applied equally to clear weather situations, especially at night, where, as here, there is uncertainty as to the movements of an approaching vessel. United States v. S. S. Washington, 241 F.2d 819 (4th Cir. 1957); Mistich v. M/V Letha C. Edwards, 219 F.Supp. 22, 24 (E.D.La. 1963); Placid Oil Company v. S. S. Willowpool, 214 F.Supp. 449 (E.D.Tex. 1963); Continental Oil Company v. M. S. Glenville, 210 F.Supp. 865 (S.D.Tex. 1962).

Moreover, the failure to use radar places upon the Boston the burden of proving that such failure did *not* contribute to the collision. In *The Bergechief* the court said:

> "A master has no more discretion to disregard this aid to navigation than he has to disregard the use of charts, current tables and soundings where the circumstances require the use thereof . . . .. The vessel that fails to use

her radar has the burden of establishing that her failure to use radar did not contribute to the collision." *Afran Transport Co. v. The Bergechief, supra,* 274 F.2d at 475.

The Boston failed to sustain the burden of proving that her failure to use her radar could not have contributed to causing the collision. Radar would have detected the positions of the tugs and scows and provided knowledge as to a safe course to follow.

In conclusion, the Boston's statutory violations and negligence were the sole causes of the collision between the Boston and the scow 106. Hence, defendants Boston and Mystic must be held liable for the collision.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and of the subject matter of this action under Article 3, Section 2 of the Constitution of the United States and under 28 U.S.C. § 1331(1).

2. Even though the tug Diana violated 33 U.S.C. §§ 171 and 172 by not turning off her two vertical white towing lights after casting off from the scows, the plaintiff sustained its heavy burden of proof under the *Pennsylvania* rule by showing that this statutory violation was not and could not have contributed to the collision.

3. Even though the scows 106 and 112 violated 33 C.F.R. § 80.17(b) (6) and (7) by not having their navigation lights visible for the required two-mile distance on a clear and dark night, the plaintiff sustained its heavy burden of proof under the *Pennsylvania* rule by showing that this statutory violation was not and could not have contributed to the collision.

4. The Boston was negligent for turning to port after sounding a two-blast whistle signal without first receiving an assent signal from the tug Diana and the tug Teresa and thus violated Rule 1, Art. 18, 33 U.S.C. § 203. This statutory violation contributed to causing the collision.

5. The Boston was negligent for failing to sound the danger signal when she failed to understand the course of the tugs and the scows ahead prior to her left turn and thus violated Rule 3, Art. 18, 33 U.S.C. § 203. This statutory violation, however, did not contribute to causing the collision.

6. The Boston was negligent by failing to obey the Narrow Channel Rule, to remain on her starboard side of the channel, and thus violated 33 U.S.C. § 210. This statutory violation contributed to causing the collision.

7. There were no special circumstances here under 33 U.S.C. § 212 requiring a departure from the specific regulations which would excuse the Boston's statutory violations.

8. The Boston was negligent in failing to slow down or stop in sufficient time to avoid the collision and this negligence contributed to causing the collision.

9. The Boston was negligent in failing to maintain a proper and effective lookout and this negligence contributed to causing the collision.

10. The Boston was negligent in failing to use properly her radar and this negligence contributed to causing the collision.

11. The defendants Boston and Mystic are solely liable for the collision between the Boston and the scow 106 on December 27, 1967.

The plaintiffs and appropriate intervening defendants are entitled to an interlocutory judgment which shall provide for determination by the court of the damages to which they may be entitled.

Settle interlocutory judgment upon notice pursuant hereto.